The **SOUTH LOUISIANA ENVIRON-MENTAL COUNCIL, INC., et al., Plaintiffs,**

and

The **Environmental Defense Fund, Inc., et al., Plaintiffs–Intervenors–Appellants,**

v.

Thomas A. **SAND, in his official capacity as District Engineer, U.S. Army Corps of Engineers, Etc., et al., Defendants–Appellees,**

and

**Morgan City Harbor and Terminal District, Defendant–Intervenor–Appellee.**

No. 78–3566.

United States Court of Appeals, Fifth Circuit.

Oct. 27, 1980.

Michael Osborne, New Orleans, La., James T. B. Tripp, Environmental Defense Fund, Stephen D. Hamilton, New York City, for plaintiffs–intervenors–appellants.

John P. Volz, U. S. Atty., New Orleans, La., for U. S. A.

Baker & Botts, F. Walter Conrad, Jr., Houston, Tex., Jacques B. Gelin, Joshua I. Schwartz, Raymond N. Zagone, U. S. Dept. of Justice, Washington, D. C., for Morgan City Harbor, etc.

Before RUBIN, HENDERSON, and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

This is an appeal from a final judgment dismissing the plaintiffs' claims seeking injunctive relief against the construction by

the United States Army Corps of Engineers of the Atchafalaya River and Bayous Chene, Boeuf and Black, Louisiana navigation project. The district court held, after a full trial on the merits, that the Corps had complied with the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.*, and Section 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1344.[1] We affirm.

### Background

The Atchafalaya River and Bayous Chene, Boeuf and Black project was first considered by the Corps of Engineers in the mid–60's and was authorized by Congress in 1968. River and Harbor Act of 1968, § 101, P.L. 90–483, 82 Stat. 731. The project entails the enlargement, to a channel 400 feet wide and 20 feet deep, of a route along Bayou Black, located east of Morgan City, Louisiana, south from its intersection with U.S. Highway 90, through the Gulf Intercoastal Waterway, along Bayou Chene and the Avoca Island Cutoff, to the Lower Atchafalaya River, out through Atchafalaya Bay to the twenty–foot depth contour in the Gulf of Mexico. A channel was also planned along Bayou Boeuf, from Highway 90, running parallel to, and west of, the Bayou Black segment, through the Intercoastal Waterway to Bayou Chene. The project was designed to facilitate the movement of offshore drilling rigs and related marine equipment between construction and service facilities on Bayous Boeuf and Black and the drilling sites in the Gulf of Mexico. The site of the project lies on the western edge of a large tidal marsh area in south central Louisiana which is approximately 945 square miles in area.

The Corps prepared an environmental impact statement, as required by NEPA, as part of the planning of this project. A draft statement was transmitted to the Council on Environmental Quality in April 1972 and widely circulated among federal and state agencies, interested organizations and citizens. Comments were received and responses made thereto in the final environment impact statement (FES) issued January 15, 1974.

This action was commenced in March 1974. There were ten plaintiffs[2] seeking declaratory injunctive relief under NEPA, FWCPA, and the Fish and Wildlife Coordination Act, 16 U.S.C. § 661, *et seq.* Other plaintiffs intervened[3] and Morgan City Harbor and Terminal District intervened as defendant. Since the completion of the Atchafalaya Bay–Gulf Reach was imminent, a hearing was held at the time on plaintiffs' motion for a preliminary injunction. The district court found that the project would have no significant effect on the level of salt water intrusion to the freshwater coastal marshlands or the Atchafalaya River, an insignificant effect upon deltaic formation in the Atchafalaya Bay, and no significant effect on back water flooding in the project area. The court, therefore, found the corresponding allegations of defects in the FES to be unfounded and denied the motion for preliminary injunction. No appeal was sought from those findings, and they were treated by the court as closed at the later trial on the merits.

Subsequent to the denial of the preliminary injunction, the Corps contracted for the completion of the Bay–Gulf Reach, which was completed December 12, 1974.

1. The abbreviations used throughout this opinion are as follows:
   Corps United States Army Corps of Engineers
   FES The original final impact statement, issued in 1974
   FSFES The final supplement to the original impact statement, issued in 1977
   FWPCA Federal Water Pollution Control Act
   NEPA National Environmental Policy Act
   USGS United States Geological Survey

2. These original plaintiffs included the City of Houma, Louisiana; the Terrebonne Parish Police Jury; a commercial trapper; a commercial fisherman; the South Louisiana Environmental Council; a hunting club; a sportsman league; two Terrebonne Parish chapters of "BASS", a national sports fishing organization; and the Terrebonne Black Bass Club, Inc.

3. These included the Environmental Defense Fund, Inc. (EDF), the Sierra Club, the National Wildlife Foundation, and the Louisiana Wildlife Federation.

The Bayou Boeuf portion was completed before trial also, and the Bayou Black Reach was nearly 50% complete at that time and is now complete. Completion of the remaining reach in Bayou Chene and the Avoca Island Cutoff is anticipated in late 1982.

In July 1974, while the Bay–Gulf Reach was under construction, the Corps promulgated new regulations subjecting the disposal of dredged spoil in navigable waters to a review process including a public hearing, pursuant to Section 404 of the FWPCA, 33 C.F.R. 209.145 (1979). Public hearings were held in early 1975, after which the Corps proposed, as an alternative to the disposal site plan adopted in the FES, to deposit the spoil in the Avoca Island Lake in order to reduce the undesirable environmental effects of disposal on wetlands. This proposal was approved by the EPA.

Modification of the spoil disposal plan required revision of the FES, so the Corps prepared a supplement (FSFES) which was filed with the Council on Environmental Quality in June 1976. Comments were again solicited, which were collected with responses and filed in final form on January 31, 1977. In February 1977 President Carter recommended that Congress not fund completion of the project because the project did not have a substantial balance of net benefits to environmental costs. Following Congressional hearings,[4] however, Congress rejected the President's recommendation and appropriated funds for the project's completion.

After issuance of the FSFES, plaintiffs amended their complaint, and trial on the merits was held in January 1978. The district court entered judgment denying plaintiffs' relief in October 1978.

On appeal, the plaintiffs contend that the project should be remanded to the Corps for further consideration because the Corps gave a distorted assessment of economic benefits and environmental costs in the FES and FSFES. The plaintiffs claim that the Corps' calculation of economic benefits was invalid due to the inclusion of invalid hurricane refuge and flood control benefits and the miscalculation of other navigation benefits. They also claim that the costs of the project were underestimated due to the Corps' failure to consider increased costs in view of a levee extension flood control proposal, and their failure to consider adequately the project's water quality impacts, impacts of economic and population growth in the project area, impacts on land loss, and alternatives to the project. They also argue that the Corps failed to comply with § 404 of FWCPA.

### Scope of Review Under NEPA

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires federal agencies, such as the Corps of Engineers, to prepare a "detailed statement" whenever they propose "major Federal actions significantly affecting the quality of the human environment."[5] By requiring an impact statement, Congress intended to insure that all agencies consider the environmental impact of their actions in the decision–making process. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). The contents of the statement are designed to insure that the effects of the project on the environment do not go unnoticed.

The Supreme Court recently gave instructions to the federal courts concerning review of NEPA challenges to agency ac-

---

**4.** *Public Works for Water and Power Development and Energy Research Appropriation Bill*, Part 9, 95th Cong., 1st Sess. (1978).

**5.** The contents of the statement are to include a discussion of the following:
1. the environmental impact of the proposed action,
2. any unavoidable adverse economic effects,

3. alternatives to the proposed action,
4. the relationship between the short–term uses and long–term production of the environment, and
5. any irreversible and irretrievable commitment or resources.

NEPA, § 102(2)(C)(i-v), 42 U.S.C. § 4332(2)(C)(i-v).

tion. Although "NEPA does set forth significant substantive goals for the nation ... its mandate to the agencies is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). Accordingly, the role of the reviewing court is similarly limited. "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences." *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (per curiam) (1980).

▆▆ In *Strycker's Bay*, the Second Circuit found that HUD had "given consideration" to the environmental requirements of NEPA but reversed the agency's decision because environmental factors were not given determinative weight. 100 S.Ct. at 449. The Supreme Court reversed, holding that the agencies are not required by NEPA to "elevate environmental concerns over other appropriate considerations." *Id.* at 500. Once the reviewing court determines that the agency has satisfied the requirements of NEPA by taking a "hard look" at the environmental consequences of its actions, the court cannot interfere with the agency decision made within its statutory discretion. *Kleppe*, 427 U.S. at 410 n.21, 96 S.Ct. at 2730 n.21, *cited with approval in Strycker's Bay*, 444 U.S. at 227, 100 S.Ct. at 500. Plenary review of agency action is warranted only if, in view of the environmental consequences of the agency action considered pursuant to NEPA, the agency decision was "arbitrary, capricious, [or] an abuse of discretion," 5 U.S.C. § 706(2)(A).

The assessment of purely economic costs and benefits for the determination of agency action is essentially a question of policy and has traditionally been considered within the exclusive province of Congress. *Oklahoma v. Guy F. Atkinson Co.*, 313 U.S. 508, 527–28, 61 S.Ct. 1050, 1060–61, 85 L.Ed. 1487 (1941) (no judicial review of Corps' cost–benefit ratio available under Flood Control Act of 1936, 33 U.S.C. § 701a).

Upon the enactment of NEPA, however, some courts, including this one, began to require some judicial review of agency determination of economic benefits. *See, e.g. Sierra Club v. Callaway*, 499 F.2d 982, 991–92 (5th Cir. 1974); *Calvert Cliffs Coordinating Committee v. United States Atomic Energy Commission*, 449 F.2d 1109, 1123 (D.C. Cir.1971); *Environmental Defense Fund v. Froehlke*, 473 F.2d 346, 356 (8th Cir. 1972). The district court below accordingly found that NEPA created a duty to appraise the economic, as well as environmental, costs and benefits of major federal projects. These decisions, however, were rendered before the Supreme Court decisions of *Vermont Yankee* and *Strycker's Bay*. In the latter cases, the Court emphasized that "[t]he fundamental policy questions appropriately resolved in Congress and in the state legislatures are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action." *Vermont Yankee*, 435 U.S. at 558, 98 S.Ct. at 1219. Determination of economic benefits and costs that are tangential to environmental consequences are within this wide area of agency discretion. NEPA, then, permits, at most, a narrowly focused, indirect review of the economic assumptions underlying a federal project described in an impact statement.

▆▆ There are occasions when a court must review an agency's assumptions pursuant to NEPA and consistent with the Supreme Court's mandate in *Vermont Yankee*. In order to fully appraise the potential environmental harms of a proposed project, they must be weighed against the economic benefits of that project. This was done in this case by the use of a cost–benefit ratio. In order for a reviewing court to determine whether an agency has complied with NEPA by giving a "hard look" at the environmental considerations, the court must also consider whether the economic considerations, against which the environmental considerations are weighed, were so distorted as to impair fair consideration of those environmental consequences. Without such a showing there is no review of

economic benefits. If the plaintiff does make such a showing, however, *Vermont Yankee* requires that the court not make an entirely independent review of the economic benefits claimed by the agency, but only "determine whether the actual balance of costs and benefits struck by the agency according to the standards of § 101 and § 102 of NEPA was arbitrary or clearly gave insufficient weight to environmental factors." *EDF v. Froehkle*, 473 F.2d at 356. *See also Calvert Cliffs*, 449 F.2d at 1115; *Environmental Defense Fund v. Corps of Engineers (Tennessee–Tombigbee)*, 492 F.2d 1123, 1139–40 n.33 (5th Cir. 1974).

■ The plaintiffs' claims are focused, in a large part, on the validity of the economic benefits sought to be achieved by construction of the project. After a thorough review of the record in this case, we conclude that the Corps did give a "hard look" at the environmental consequences of the project, and the decision to complete it cannot be said to be arbitrary and capricious.

### Challenged Economic Benefits

Throughout the history of this project the Corps has claimed that one of the project's benefits will be to afford hurricane refuge for mobile drilling rigs operating in the Gulf of Mexico near the project area. This claim was based on interviews conducted in 1966 which indicated that mobile drilling rigs would disengage from drilling operations to seek hurricane refuge in inland waterways. The operators in the project area had been using refuge facilities far distant from their area of operation in the Gulf and indicated they would use Morgan City facilities if available. The plaintiffs challenge the inclusion of these hurricane refuge benefits into the cost–benefit ratio, because present standards for drilling structures require them to be able to withstand a hurricane with sustained winds of 100 m. p. h. while in the drilling mode, so that inland hurricane refuge is no longer required. The district court found that although the initial inclusion of hurricane refuge benefits was valid, by the time of preparation of the

FSFES the inclusion of those benefits for mobile rigs was erroneous.

Similarly, the district court found that the evidence at trial showed that the flood control benefits claimed by the Corps was invalid. The Corps claimed that widening the channel would reduce the amount of dredging needed for flood control in 1990. Since the court found that the Corps had not yet decided which flood control alternative to use, the inclusion of this benefit, which was just one of the alternatives considered, was premature. These findings are supported by the evidence at trial.

The district court also found, however, that the invalidation of the hurricane refuge and flood control benefits, which amount to 42% of the total benefits claimed for the project,[6] does not render the environmental impact statement defective under NEPA. The district court specifically found that the elimination of these benefits reduced the benefit–cost ratio from 2.2:1 to 1.2:1, but would not reduce it below parity. Since 1.2:1 is almost identical to the 1.4:1 ratio relied on by Congress when the project was reappraised in 1977, the court concluded that Congress had not been misled by an inaccurate statement of the environmental costs of the project.

■■ The plaintiffs argue that the district judge was "comparing apples to oranges" because the 1.4:1 ratio was based on a 6¾% interest rate and the 1.2:1 ratio was based on a lower 3¼% rate. They argue that without the invalid benefits the ratio at a 6¾% rate would drop from 1.4:1 to 0.8:1, below parity. We find the plaintiff's argument unconvincing. The Corps is required by law to use a 3¼% discount when considering this project. Water Development Act of 1974, 42 U.S.C. 1962d–17. Using this rate, the ratio drops from 2.2:1 to 1.2:1 when the flood control and hurricane refuge benefits are deleted. This ratio is identical to the ratio which appears in the original FES and was used when the project was originally authorized by Congress. When the project was reconsidered

---

**6.** 40% of the claimed benefits are attributed to hurricane refuge and 2% to flood control.

the benefit–cost ratio calculated with the statutory interest rate was 2.2:1. Congress was very aware of the environmental problems which surrounded the project, but chose to approve it (over the President's contrary recommendation) in spite of these problems. Congress thus became the ultimate decision–maker. Such a legislative decision effectively supplants the Corps' decision to build the project, and precludes our review of that substantive decision. *Tennessee–Tombigbee*, 492 F.2d at 1140–41. Our review is therefore limited to the Corps' procedural compliance with NEPA in preparing the impact statement. Only if Congress was misled by the inclusion of these erroneous benefits in its consideration of environmental consequences may we remand to the Corps for reconsideration.[7]

We cannot say that Congress was misled by the inclusion of these benefits since NEPA is concerned with the disclosure and consideration of *environmental* consequences. Flood control and hurricane refuge benefits are wholly economic, with only a peripheral relationship with any type of environmental impact. Their deletion does not change the cost–benefit ratio to such a degree that it actually distorts the context in which the environmental analysis occurs.

Moreover, even though the hurricane refuge benefits for large mobile rigs are now invalid, there was evidence presented at trial that other large vessels such as launch barges, derrick barges and material barges would use the project channels for hurricane refuge. Before the dredging authorized by this project, these vessels could not enter the waterways without stopping to ballast and deballast which requires substantial time and money. These vessels previously sought refuge in waterways a greater distance away, but since completion of the Bay–Gulf Reach now use the project waterways. Some hurricane refuge benefits continue to exist, and we conclude that Congress was not misled by the erroneous inclusion of benefits for mobile rig hurricane refuge.[8]

The plaintiffs also challenge the inclusion of other navigational benefits besides hurricane refuge. The plaintiffs contend that the variables used by the Corps in estimating the benefits from transportation time saved in connection with the installation, maintenance and repair of drilling rigs are arbitrary: specifically, the well drilling rate relied upon by the Corps to project the number of wells to be drilled in the project area and the updated estimate of the fair rental value of vessel and drilling equipment. The district court found that the Corps selection of data was not arbitrary and we agree.

When the Corps made its original economic calculations of the claimed navigational benefits for this project in 1966, it based its calculations on a forecast by the United States Geological Survey as to the number of wells that would be drilled in the project area over the fifty year life of the project. In 1974 the USGS reassessed the number of wells it estimated would be drilled and substantially reduced its previous estimate from an average of 244 wells per year to 110 wells per year. The forecast also stated that 95% of the wells would

7. NEPA does not require that a cost–benefit ratio be included in the impact statement. The statute only requires consideration of "the previously unconsidered by giving weight and consideration to the ecological costs to future generations in deciding whether present economic benefits indicate that the depletion of irreplaceable natural resources should proceed in the manner suggested or not at all." *Sierra Club v. Morton*, 510 F.2d 813, 827 (5th Cir. 1975). The statement is sufficient if it gives "the decision maker and other readers enough detail concerning all of these costs and benefits to permit reasoned evaluation and decision ...." *Id.*

8. The plaintiffs argue that the admission of testimony concerning these benefits was improper under Rule 804(b)(5), F.R.Evid., and the "best evidence rule." The witnesses' testimony from their own personal knowledge, however, was sufficient to indicate that there are benefits accruing to the project which were not quantified in the impact statements. Although we agree that this evidence may not be used to increase the benefit-cost ratio, *Montgomery v. Ellis*, 364 F.Supp. 517, 533 n.9 (N.D.Ala.1973), as the trial court said, it does support the integrity of the Corps' ongoing review of the project's validity.

be drilled in the first 20 years of the project's life. The Corps questioned the accuracy of the new report since 468 wells had actually been drilled in 1973 and the rate had been increasing since 1968. The Corps then retained the private geological consulting firm of Atwater, Carter, Miller & Heffner to make an independent estimate of the number of wells to be drilled. The Atwater report estimated a total of 14,626 wells would be drilled, with an arithmetic average of 293 wells per year. The Corps used in its report the number of wells from the Atwater report and the accelerated drilling rate from the USGS report, estimating 467 wells per year for the next 20 years.

The plaintiffs assert that the Corps arbitrarily chose the rate most advantageous to its position so that the quantification of the anticipated benefits could be increased. The district court found that the Corps chose the portions from each of two divergent estimates that proved accurate based on actual experience in the area. Therefore, the decision was not arbitrary. We agree. The plaintiffs fail to present any evidence proving that the Corps estimate was inaccurate and, more importantly, as the district court noted, the selection of data reflects a proper exercise of agency discretion. The selection of data for the determination of economic non–environmental benefits is extremely tangential to the concerns expressed in NEPA. Court intrusion into agency decisions of this kind must be extremely limited. Here there was no showing that the selection of data used to determine the drilling rate, which, in turn, was used to determine the number of trips through the channel to and from the drilling sites for the final calculation of time saved, had any effect on the presentation of the *environmental* consequences of the project. At most, plaintiffs demonstrated that there was a divergence of viewpoints among experts in this matter, which does not render an impact statement

inadequate. *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir.), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1973). We refrain, as we must, to undertake such an unrestricted review.

■ We also reject, as did the district court, the plaintiffs' argument that the FSFES is invalid due to improper estimate of the fair rental value of equipment moving through the project's waterways. The Corps updated the estimate of equipment costs in 1975 to accommodate for inflation and applied the new values to the calculations made in 1968. This resulted in an increase in the benefit–cost ratio from 1.2:1 to 2.2:1. The plaintiffs contend the calculations are erroneous because the more expensive equipment is capable of supporting more wells than the Corps originally calculated in 1968, and therefore the number of trips per well should be proportionately reduced, and the total transportation savings should correspondingly be reduced. The Corps' failure to do so, however, was not arbitrary and capricious. The record fails to show that the actual capability of the rigs is substantially higher than the Corps' 1966 estimate, or that the number of trips per well is substantially lower than that estimate. We agree with the district court that since the Corps kept the number of trips on which it based its calculations constant, despite the substantial increase in the number of wells drilled between 1968 and 1974, the calculation is fair and reasonable. We cannot see how this could possibly put the environmental considerations in a false light.

If we were to review the factors of the Corps' economic benefit analysis in the plenary fashion requested by the plaintiffs, all chaos would ensue. As the Corps noted in oral argument, projects such as the one considered here have an extremely long gestation period. This particular project has undergone studies since its inception in 1968.[9] Over time, the economic realities do

9. Litigation in environmental areas may kill challenged projects by delay. Although the plaintiffs may lose on the merits, often they win as a practical matter. Attorneys fees and

delay are expensive and when such costs are attributed to a project, its continuance may be no longer justified. *Cf. Scenic Hudson Preservation Conference v. Callaway*, 499 F.2d 127

change. But once Congress has authorized a project, it is not for the courts to review its economic justification. Congress has allowed limited review of such projects under NEPA, but we are to evaluate the economic justification only if it has become so flawed that it grossly distorts the environmental considerations. It is not for the courts, under the authority of NEPA, to review every economic calculation which an agency puts into its environmental impact statement. Barring the extreme case, it is for Congress to determine when to reevaluate the economic justification for a particular project. After just such a reevaluation, this project was continued. We refuse to substitute our judgment for that of Congress and the Corps.

### The Avoca Island Levee Extension

Since the early 1950's, guide levees have existed on both sides of the Atchafalaya River that provide flood protection by funneling overflow flood waters out into the Atchafalaya Bay. Presently, the left guide levee, called the Avoca Island levee, extends to the point at which the Bayou Chene and Avoca Island Cutoff enter the Atchafalaya River. Due to the natural building of the delta in the Atchafalaya Bay, the hydraulic conveyance capacity of the river has diminished, resulting in increasing flood stages in the project area. The flood protection afforded by the levee, therefore, is no longer sufficient and the Corps has found it necessary to plan additional flood protection. In September 1966 the Corps contemplated a southward extension of the Avoca Island levee. Should the levee be extended, a relocation of the Bayou Chene–Avoca Island Cutoff reach of this project would be necessary.

The plaintiffs assert that the project's environmental impact statement is deficient because it does not refer to the increased economic and environmental costs which would occur should the relocation take place. They contend that a relocation of

the channel would destroy large areas of environmentally important wetlands which are not reflected in the FSFES.

The district court found that although the extension of the levee would have a direct and significant impact on the navigation channel and a cumulative impact on the environment, NEPA does not require a discussion of the Avoca Island levee extension in the FSFES. Although the extension was formally proposed in 1966, it was later consolidated into the more comprehensive ongoing Atchafalaya Basin Water and Land Resources Study. The Corps is considering several flood control alternatives, of which the levee extension is only one. Although some type of flood protection will be necessary, it is quite uncertain at this time as to which alternative will be chosen. The FSFES does not discuss the impacts that the levee extension would have on the project. The FSFES, however, does reflect the pendency of the ongoing study and its relation to the possibility of the extension of the levee.

We agree with the district court that the FSFES is not inadequate because of the failure to discuss the impacts of an extension of the Avoca Island levee. Although NEPA "may require a comprehensive impact statement in certain situations where several proposed actions are pending at the same time", *Kleppe*, 427 U.S. at 409, 96 S.Ct. at 2730, cumulative impact statements are required only when the action is actually a "proposed action."

"[NEPA] does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions. Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will

(2d Cir. 1974) (this was the fourth trip to the Second Circuit for the Stormking hydroelectric project, after which Consolidated Edison apparently shelved the project because of cost

increases caused by delay. Gellhorn, Administrative Law, Cases and Comments 963–65 (7th ed. 1979)).

reflect earlier proposed actions and their effects."

427 U.S. at 410 n.20, 96 S.Ct. at 2730 n.20; *see also* 40 C.F.R. 1508.23 (1979).

The district court found that the extension project is no longer a pending agency proposal that requires lengthy discussion in the FSFES. That finding is not clearly erroneous. Should the extension ever become a pending proposal it will be reviewed on its own environmental impact statement at that time. "[A]n agency could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals." *Kleppe*, 427 U.S. at 414 n.26, 96 S.Ct. at 2732 n.26.

### Environmental Impacts—Water Quality

The plaintiffs assert that the FSFES is inadequate because it does not discuss the water quality impact that will result from the project's destruction of wetlands. The district court found that although the destruction of wetlands could have an effect on water quality in the area, the Corps' failure to address the issue in the FSFES did not render it inadequate.

■ The plaintiffs' expert testified that marsh and swamp act to filter water as it goes through the wetland area, decreasing the nutrient level which is a significant element of water pollution. Although this is undoubtedly true, the plaintiffs have failed to show that the loss of 1% of the wetland acreage in the area will significantly affect the water quality of the area. The Corps introduced testimony at trial that the state agency responsible for water pollution control did not rely on the wetlands for waste control, but requires on–site treatment of waste before it is discharged into the waterways. In addition, as the district court recognized, neither the responsible state agencies nor the EPA commented on the loss of marshland as having a significant impact on water quality. The district court also found that the Corps had overstated the loss of wetlands by failing to take credit for the wetlands that would be created by the disposal of dredge materials. In view of the Corps' extensive discussion on water quality impacts, we agree that the agency gave the required "hard look" to the project's significant impacts on water quality.

### Secondary Impacts—Population Growth & Economic Development

Plaintiffs also fault the FES and FSFES for inadequate discussion of the possibility that the project may enhance population growth and economic development in the flood plain area, which may limit flood–control options in the future. The FSFES acknowledges that industrial development may be induced by the completion of the project, but concludes "there is no indication ... as to the rate nor the total amount of development that will result with project installation." The Corps concluded that growth, if any, would help reduce unemployment emigration of the youth away from the area, and that any development would subsequently be controlled by applicable regulations. The plaintiffs argue that the Corps should have made use of more sophisticated techniques to project the extent of growth in the area, so that it could be determined if growth would expand into areas prone to flooding.

■ NEPA does require that these secondary impacts be disclosed in the FES. *Sierra Club v. Callaway*, 499 F.2d at 994. The agency must discuss these impacts, however, only if they would result in significant adverse environmental effects. *Tennessee–Tombigbee*, 492 F.2d at 1137. Otherwise a general discussion will suffice.

■ The environmental impacts asserted by the plaintiffs here are only speculative; the disclosure in the FSFES thus was satisfactory. The plaintiffs' primary complaint is that the Corps did not use more sophisticated planning methods to determine possible impacts. We cannot find that the impact statement is deficient for the Corps' failure in this regard. To do so would require additional procedures of the

agency in their preparation of the statement, above and beyond that required by the statute, which is exactly what *Vermont Yankee* and *Strycker's Bay* prohibit.

### Land Loss

█ The plaintiffs assert that the statement is deficient due to the failure to discuss the project's contribution to land loss which has been occurring in coastal Louisiana since the turn of the century. Direct land loss, from the channel itself and land used for disposal of dredge material, was disclosed in the FSFES. The plaintiffs introduced some testimony that there may be some indirect land loss due to interference with the deltaic process. The Corps, however, introduced evidence to the contrary and the district court found that the project would create an offsetting amount of marshland. Any land loss therefore would not have a significant impact on the environment. This finding is supported by the evidence and is not clearly erroneous.

### Alternatives

█ The plaintiffs finally challenge the adequacy of the consideration of alternatives to the project in the impact statement. The district court found that the Corps made a good faith effort to describe in detail the reasonable alternatives to the project. We agree.

NEPA does require a discussion of all alternatives to a project which would reduce environmental harm while still achieving the goals to be accomplished by the proposed action. Once the agency adequately describes the viable alternatives, however, the decision of which alternative to follow is within the agency's discretion. Several alternatives were considered in the FES and FSFES; but the plaintiffs contend that three alternatives—(i) the relocation channel alignment around the extended Avoca Island Levee, (ii) delay of construction pending resolution of the flood control issues in the Lower Atchafalaya Basin, and (iii) use of existing deep water navigation channels—were not discussed but deserved consideration in the impact statements.

The first alternative set forth by the plaintiffs is not required to be considered because the levee extension itself is so speculative that it does not require discussion. Absent such an extension, a relocation of the channel would not be required, so it need not be considered as an alternative to the proposed project.

Also, the second alternative set forth by the plaintiffs is not a viable alternative requiring discussion. The Corps is not required to wait for the completion of studies by other agencies, *Environmental Defense Fund, Inc. v. Hoffman (Cache River II)*, 566 F.2d 1060, 1068 (8th Cir.1977), and, therefore, is not required to await the completion of the Atchafalaya Basin Water and Land Resources Study. The pendency of the study was fully disclosed in the FSFES and no more is required by NEPA.

The plaintiffs' third alternative is the no-action alternative which was discussed in the FES and FSFES. Although, obviously, the adverse environmental effects would not take place were the project to be stopped, the Corps found that the transportation benefits achieved through the use of the project would not be achieved through the use of existing waterways. No action, as an alternative, was adequately discussed and considered by the Corps.

### § 404 of the FWPCA

Plaintiffs also contend that the Corps' approval of the project is invalid under § 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1344. They contend that with the benefits of the project overstated from the inclusion of non–existent hurricane refuge and flood control benefits, the benefits of the project do not outweigh the damage to the wetlands resource as required by the statute. They contend the project should be reconsidered with a new benefit–cost analysis because neither the Corps nor the EPA have properly reviewed the project. The district court found that although the inclusion of the hurricane refuge benefits was arbitrary, the project's benefit–cost ratio was above parity when these benefits were excluded.

The plaintiffs assert in their brief that the exclusion of these benefits would render "the net benefits from the project so *marginal* that the District Engineer could reasonably conclude that these benefits do not 'outweigh the damage to the wetlands resource' that would result from the disposal of the dredging spoils." (Emphasis added). The statute and regulations require a ratio above parity only. Even a marginal benefit is sufficient to satisfy the statute. The district court found that the ratio would remain above parity even with the hurricane refuge benefits excluded and, as we indicated earlier, this finding is not clearly erroneous. We also agree with the district court that the Corps, with the EPA, made a concerted effort to reduce the destruction of wetlands resulting from the project and the FSFES shows a comprehensive review of alternative alignments for the project and dredge disposal plans. In fact, the original disposal plan was changed in order to better follow the dictates of § 404. After reviewing the record we agree with the district court that the Corps made a good faith effort to satisfy its § 404 obligations and has not violated the statute. To require a reconsideration of the project on the basis of the "marginal benefits" of the project would be an impermissible substitution of our judgment for the expert judgment of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

#### Conclusion

After a thorough consideration of the voluminous record presented on appeal, we feel that the Corps acted in objective good faith throughout the consideration of this project. The decisional process for such a project is extremely prolonged, and the Corps has remained mindful of its statutory obligations to consider the environmental consequences of its actions at all times. For all the reasons set forth above, we affirm the decision of the district court.

AFFIRMED.