719 F.2d 1272
 21 ERC 1307
 VIEUX CARRE PROPERTY OWNERS, RESIDENTS AND ASSOCIATES, INC.,
et al., Plaintiffs-Appellants,
v.
Samuel R. PIERCE, Jr., etc., Defendant,
and
City of New Orleans, Defendant-Appellee,
and
Canal Place One, Intervenor-Appellee.
 No. 82-3558.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 21, 1983.
 
 Derbes & Derbes, James G. Derbes, James R. Logan, New Orleans, La., for plaintiffs-appellants.
 Barham & Churchill, David A. Marcello, Margaret E. Woodward, New Orleans, La., for City of New Orleans.
 Stone, Pigman, Walther, Phillip A. Wittmann, Cathy S. Glaser, New Orleans, La., for intervenor-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN and JOHNSON, Circuit Judges, and CASSIBRY, District judge*.
 JOHNSON, Circuit Judge:
 
 
 1
 Appellants, Vieux Carre Property Owners, Residents and Associates, Inc., and the Louisiana Landmark Society, filed this lawsuit against the United States Department of Housing and Urban Development (HUD) and the City of New Orleans (the City) seeking to enjoin the use of federal funds granted to the City pursuant to an Urban Development Action Grant (UDAG). The grant would fund public improvements adjacent to Canal Place, Phase I, to be used in connection with Canal Place, Phase II. Phase II is a hotel, retail and parking development presently under construction in the Central Business District of New Orleans near the foot of Canal Street. Plaintiffs argue that federal funds should be withheld because the City, as the entity delegated responsibility for an environmental and historic preservation review, had not complied with the provisions of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Sec. 4321, et seq., and the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. Sec. 470, et seq. The developer of Canal Place and beneficiary of the UDAG funds, Canal Place 2,000, intervened in the lawsuit.
 
 
 2
 A temporary restraining order halting construction was denied and summary judgment was granted by the district court in a well-reasoned opinion on August 10, 1982 in favor of HUD, the City, and Canal Place 2,000, dismissing plaintiffs' lawsuit. Plaintiffs have appealed against the City and Canal Place 2,000, but have not pursued an appeal against HUD. We affirm the district court's decision.
 
 I. Facts
 
 3
 The City of New Orleans is an eligible recipient of UDAG funds under Title I of the Housing and Community Development Act of 1974 (HCDA), as amended 42 U.S.C. Sec. 5301, et seq., and its implementing regulations, 24 C.F.R. Sec. 570, et seq. Action Grants provide assistance to "distressed cities" to stimulate private and public investment and strengthen the economic, employment and tax bases of the urban area. See generally, 24 C.F.R. Sec. 570.450(a).
 
 
 4
 On January 20, 1981, the City filed a grant application with HUD for UDAG funds to implement public improvements associated with a hotel, retail and parking complex (Canal Place, Phase II) to be constructed near the river end of Canal Street. More particularly, the UDAG project is planned as a 511-room hotel, a 223,000 square-foot multi-level shopping mall and a parking facility to accommodate 1550 vehicles. The federal funds requested in the grant application will be used for the following civic improvements to be enjoyed by the citizenry at large:
 
 
 5
 1. Sidewalk construction within the vicinity of Canal Place;
 
 
 6
 2. Streetlighting within the vicinity of Canal Place;
 
 
 7
 3. Landscaping within the vicinity of Canal Place;
 
 
 8
 4. Elevated pedestrian walkway from Canal Street to the Mississippi River Ferry;
 
 
 9
 5. Relocation of New Orleans Public Service, Inc. (NOPSI) power lines and support lines; and
 
 
 10
 6. NOPSI substation screening.
 
 
 11
 Canal Place 2,000, a Louisiana ordinary partnership and joint venture, is the developer of the project. Joseph Canizaro, the managing partner, is a well-respected developer of numerous office buildings in downtown New Orleans and is active in various civic organizations concerned with urban growth in New Orleans. Although the City requested a grant in the amount of $10 million, HUD preliminarily approved a $6 million grant for the public improvements in April of 1981. The developer will expend over $100 million of private funds on the UDAG project.
 
 
 12
 Although the overall Canal Place development was once envisioned as a thirteenacre development extending from Canal Street to Conti Street in the Vieux Carre District and from Decatur Street to the river's edge, the UDAG site actually proposed in the instant case (Canal Place, Phase II) is bounded by Canal Street, North Peters Street, Ibberville Street, and the NOPSI substation. Phase II is adjacent to a presently existing thirty-two story office building (Phase I) in operation since 1979. A master plan developed in the mid-70's contemplated three later phases (a total of five phases) in the complete thirteen-acre development. Although plaintiffs would have the court believe that the five-phase master plan is a "fait accompli," Phases III through V[1] are indefinite and speculative in nature; no final plans nor private funding commitments exist as to Phases III through V, and no further design work or land acquisition as to Phases IV and V has been performed since 1978. Indeed, the developer owns none of the land or air rights for Phase IV but owns some but not all the land for Phase V.
 
 
 13
 Phase II is located in the Central Business District in an area containing numerous hotels. Although the UDAG project area is located within the Vieux Carre National Historic Landmark District, it is not under the jurisdiction of the Vieux Carre Commission. The UDAG is a key component of the economic development strategy for downtown New Orleans and was intended to provide a retail anchor at the lower end of Canal Street, needed hotel rooms to bolster the City's vital tourist industry, and a stimulus for restoration of existing deteriorated buildings in the immediate area.
 
 
 14
 The private development portion of the UDAG project has been publicly scrutinized since its inception by the City Planning Commission, the Mayor's Office on Special Projects, the Vieux Carre Commission and countless civic organizations and boards. Contrary to the plaintiffs' suggestion, the UDAG project has been assessed, modified, and reassessed in order to arrive at a final Phase II that is in conformity with all applicable zoning ordinances. The Phase II site is a part of the Central Business Plan Community District, a zoning district developed and approved after a lengthy review process before the City Planning Commission and the City Council.
 
 
 15
 Under NEPA and NHPA, HUD is responsible for conducting an environmental and historic preservation review of this UDAG project. A provision of the Housing and Community Development Act, 42 U.S.C. Sec. 5304(h)(1), authorizes HUD to delegate to the UDAG applicant the responsibilities for environmental review, decision-making and action. The City was the UDAG applicant. Accordingly, the City Planning Commission, in coordination with the Mayor's Office of Federal Programs and Special Projects, undertook the responsibility for assessing the impact of Phase II upon the surrounding environment, including the adjacent Vieux Carre.
 
 
 16
 The assessment process commenced shortly after the UDAG application was filed. Phase II development plans were presented at two public meetings on January 28, 1981 and February 24, 1981. The effects of the UDAG project on the surrounding environment were assessed, including but not limited to effects upon the soil, the archeological remains, the water and air, the socioeconomic conditions of the area, the visual effects and the traffic.
 
 
 17
 Various agencies were consulted during the review process. In accordance with the provisions of NHPA, the City requested the State Historic Preservation Officer (SHPO) to render an opinion as to whether Phase II and the UDAG-funded public improvements would have an impact on the Vieux Carre. The SHPO and his staff reviewed the UDAG project, consulted with the Vieux Carre Commission, the City, and the developer, and made site visits, thereafter concluding that they had no objections to Phase II implementation. The developer had consulted with the Vieux Carre Commission on an ongoing and informal basis in regard to the Canal Place project since the mid-70's. After the UDAG application was submitted, Phase II was officially presented to the Commission, and it approved the federally-funded improvement, including relocating NOPSI power lines into the Vieux Carre.
 
 
 18
 The results of the City's environmental and historic preservation review were compiled in a comprehensive Final Environmental Assessment, presented to the City Planning Commission and adopted by the Commission on May 6, 1981. In all, a 298-page environmental assessment was submitted to HUD for final approval. This assessment is the backbone of the efforts of the City and developer to examine the environmental and historic impact of the project and to familiarize the citizenry with a UDAG project that will provide 954 new jobs, increase the federal, state and city tax base, provide a boost to the tourist industry and revitalize a vacant underdeveloped section of the Central Business District near an already developed and bustling tourist attraction--the Vieux Carre historic district.
 
 
 19
 The City and the developer vigorously defended their Final Environmental Assessment as a document in full compliance with the requirements of NEPA and NHPA. The district court, after thoroughly reviewing the City's historic and environmental review process, rendered summary judgment in favor of the City, HUD and Canal Place 2,000, concluding that the City's environmental assessment complied with NEPA and NHPA. This appeal followed.
 
 II. Merits
 
 20
 Appellants make several attacks upon the district court's granting of a summary judgment in favor of the City and Canal Place 2,000. Specifically, appellants contend that the City's environmental and historic review was defective since the UDAG proposal concentrated only on Phase II, omitting Phases III and V from the City's NEPA and NHPA review. Appellants also maintain that the City improperly concluded that an environmental impact statement was unnecessary and that the City failed to investigate, mitigate and consider alternatives to Phase II as required under federal legislation. Finally, appellants contend that the City's environmental assessment was defective in its treatment of several factors and does not constitute the "hard look" required by NEPA.
 
 
 21
 In reviewing the district court's granting of the summary judgment, we apply well-settled principles of appellate review. This Court must view the evidence and the inferences to be drawn therefrom in the light most favorable to the party opposing summary judgment. When viewed in this light, we must determine whether there is any genuine issue as to any material fact and whether the movant is entitled to summary judgment as a matter of law. See Fed.R.Civ.P. 56(c); Poller v. Columbia Broadcasting System, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); and United States Steel Corp. v. Darby, 516 F.2d 961 (5th Cir.1975). As did the district court, we find "no disputed question of fact material to the determination of the reasonableness of the City's decision."
 
 A. The Scope of the UDAG Project
 
 22
 Appellants strenuously contend that the City improperly limited its environmental and historic review to Phase II, since preliminary planning and designing had been undertaken for Phases III and V. Indeed, most of the plaintiffs-appellants' criticisms have been directed at an uncertain Phase III which, as originally planned, would consist of a 750-foot office tower. Throughout the proceedings, plaintiffs have attempted to redefine the UDAG project to include Phase III so that it, too, would be the subject of an environmental assessment. Equating the plans laid for Phase III, when Canal Place was originally conceived, with the present commitment to build, the plaintiffs have implied that Phase III is a present reality that was omitted from the UDAG application for the sole purpose of avoiding environmental scrutiny. However, nothing in the record supports this view. As the district court found, all indications are that plans for Phase III and other future phases have been shelved for economic and other reasons.
 
 
 23
 HUD regulations established some pertinent guidelines for the proper scope of environmental review under NEPA. An "activity" encompasses "[t]hose actions funded or authorized to be funded with Title I assistance and those related actions which are not so funded or not authorized ..." but which are put forth by the applicant as part of its strategy for the treatment of a project area. 24 C.F.R. Sec. 58.2(a)(1). Regardless of funding sources, integrally related activities designed to accomplish, in whole or in part, a specific goal are to be grouped together for consideration as a single project. Moreover, closely related and proposed or reasonably foreseeable actions that are related by timing or geography also must be considered together.
 
 
 24
 Naturally, the UDAG-funded public improvements are part of the "activity": relocation of power lines; the NOPSI substation screening and landscaping of other public areas; street lighting and construction of an internal circular roadway; and construction of sidewalks and an elevated pedestrian walkway to the Mississippi River Ferry. In spite of the private funding for the hotel and shopping mall of Phase II, this construction was grouped together with the UDAG-funded improvements for consideration as a single project because it was integrally related and part of the developer's strategy for "the treatment of the project area." 24 C.F.R. Sec. 58.2(a)(1).
 
 
 25
 Plaintiffs contend that Phases III and V should also be included in the project definition because they were included in the developer's mid-70's master plan for the site, would share uncertain Phase II amenities, if constructed, and would benefit from some of the improvements financed by the UDAG. However, none of these factors remove Phases III and V from the planning stages where they have remained without any progress that would invite or even allow environmental and historic review.
 
 
 26
 Although an earlier UDAG application included Phases II and III in its project description, that UDAG application was withdrawn in 1979 since there was no firm financial commitment for Phase III. That application was withdrawn in accordance with 24 C.F.R. Sec. 570.458(c)(5), which declares that "[n]o application will be considered feasible and effective unless there is evidence of at least a firm private commitment [of financial resources] and if necessary, a firm public commitment." See also 24 C.F.R. Secs. 570.451(i) and (j). That experience undoubtedly affected the 1981 draft of the UDAG application, which would have failed again to satisfy the financial commitment requirement if the financially unsound Phases III and V had been included. Indeed, there were not even detailed drawings on which cost estimates could be based, much less a firm financial commitment. Contrary to plaintiffs' speculation that future phases have become more probable with the passage of time, the developer testified without contradiction that the last designs for Phase III had been prepared before the first UDAG application was withdrawn and that these designs would not support a financial commitment. Witness Canizaro testified:
 
 
 27
 Q. Hasn't Phase III been successfully designed to attempt to get financial backing for it?
 
 
 28
 A. No, Sir.
 
 
 29
 Q. But you had given Aetna sufficiently detailed presentation with respect to the size of the building and the space available in the building and the location of the building so that Aetna could express an interest?
 
 
 30
 A. That is not correct. Aetna expressed an interest because they had done the first building.
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 As I indicated there are many things that would have to be done before Aetna would issue a commitment. I have already indicated leasing to be one, I can enumerate many. Another obviously is a more complete set of plans, pricing from a contractor--many, many things.
 
 
 34
 See Appellee's Exhibit 57, at 21-22. Moreover, Canizaro explained that before a development, especially an office building would be ready for construction or ready to secure funding, a major tenant must be obtained: "I would say Phase III would not be built without a major tenant and we have not had a major tenant in hand." Id. at 42. For these and other reasons, Canizaro said funding had neither been sought nor obtained for Phase III, id. at 23-24; and testimony that there had been meetings with potential lenders, which apparently came to naught, does not offer the contradiction plaintiffs see in it.
 
 
 35
 As to Phase V, there was even greater uncertainty. David Richardson, Project Director, described the state of the plan for Phase V: "There are a series of studies showing various alternatives, what offices are available and recommendations as to what the best direction to go was." See Appellee's Exhibit 55, at 26-27. In the words of Joseph Canizaro, "You would have to call it very preliminary outline sketches of subsequently developed model that would give us some idea of density, height, aesthetic finish [and] those type elements that were so necessary in doing some economic analysis and impact analysis and aesthetic analysis." See Appellee's Exhibit 57, at 13. Significantly, it is also clear beyond material factual dispute that the developer did not own all the land on which he proposed to situate Phase V.
 
 
 36
 While public improvements funded by the UDAG might incidentally benefit future phases should they ever be built, all were necessary for the construction of Phase II, which was designed to stand alone: "[P]hase II was designed so it can function perfectly normal forever and ever without Phase III ever being built." Appellee's Exhibit 55, at 48. Confronted with a project that had independent utility, the City properly determined that it should be assessed independently of future speculative phases. Not only was the decision imminently reasonable under the facts before the City, it was entirely consistent with this Court's holdings that "NEPA does not require an agency to consider the possible environmental impacts of less imminent actions when preparing the impact statement on proposed actions." South Louisiana Environmental Council, Inc. v. Sand, 629 F.2d 1005, 1015 (5th Cir.1980), quoting Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 2730 n. 20, 49 L.Ed.2d 576 (1976). As was the situation in Environmental Defense Fund v. Marsh, 651 F.2d 983 (5th Cir.1981), "we are here dealing with two projects that are historically distinct, one of which is proposed and the other still in the process of study and design. In that situation, NEPA does not yet require the [agency] to evaluate the environmental impact of the [second project]." Id. at 999.
 
 
 37
 Appellants also suggest that exclusion of Phases III and V from the historic and environmental review will violate this Court's holding in Piedmont Heights Civic Club v. Moreland, 637 F.2d 430 (5th Cir.1981), since such a decision will foreclose the opportunity to consider alternatives to the proposed development and irretrievably commits federal funds for closely related projects. See Piedmont Heights Civic Club v. Moreland, 637 F.2d at 439. According to the plaintiffs, the district court overlooked the second half of the Piedmont Heights test--foreclosure of the opportunity to consider alternatives and irretrievable commitment of federal funds for closely related projects. Id. As we have seen, however, the City reasonably concluded that Phases III and V were indefinite and remote, with major obstacles in the path of their construction. Because funding has not been secured at all for any future phase, there is no basis for speculating whether it might (if ultimately undertaken) be private or public; if the projects were constructed and federal funds were used again, another environmental review necessarily will be undertaken. By finding that future phases were speculative and expressly limiting its decision to Phase II, the district court, in effect, determined that, as in the case of any indefinite plan, the opportunity to consider alternatives had not been foreclosed and federal funds had not been irretrievably committed to related projects. As did the district court, we expressly limit the scope of our review to Phase II. The doors of the courts remain open should federal funding be utilized in connection with any future development of Phases III-V.
 
 
 38
 B. The City's Determination Not to File an Environmental Impact Statement
 
 
 39
 The appellants contend that the district court erred by concluding that the city reached a reasonable decision when it decided not to file an environmental impact statement. According to the appellants, Canal Place, Phase II will have a significant effect on the quality of the human environment and, hence, an environmental impact statement should have been prepared by the City. We disagree.
 
 
 40
 The standard of judicial review concerning the City's failure to file an environmental impact statement was recently set forth by this Court in Save Our Wetlands, Inc. v. Sands, 711 F.2d 634 (5th Cir.1983). As Chief Judge Clark noted: "the standard of judicial review is whether the agency decision not to develop an impact statement is reasonable and made objectively and made in good faith on a reviewable environmental record. If the decision is reasonable, 'the determination must be upheld.' " Id. at 644, quoting Save the Bay, Inc. v. United States Corps of Engineers, 610 F.2d 322, 325 (5th Cir.), cert denied, 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980). The appellants carry the burden on appeal of demonstrating that Canal Place, Phase II will significantly degrade the human environment in this bustling metropolitan area of New Orleans. See Save Our Ten Acres v. Kreger, 472 F.2d 463, 466-67 (5th Cir.1973).
 
 
 41
 In affirming the City's decision not to file an environmental impact statement the district observed:
 
 
 42
 Phase II will be erected in the midst of downtown New Orleans in an area abounding with similar hotel facilities and retail outlets. Its 511-room hotel is intermediate in size when compared to other downtown hotels. Phase II is lower in height than Phase I and other downtown buildings already in place. As the plaintiffs admit, it also conforms with existing zoning ordinances. Such compliance is indicative of no significant NEPA effect.
 
 
 43
 Record, vol. 1, at 960.
 
 
 44
 There is no hard and fast definition of "significant" effect. In the absence of any congressional interpretation of the term, the courts have struggled to give it concrete meaning. As we have seen, the district court clearly considered the context of Phase II and concluded, based upon the administrative record, that the City's conclusion not to file an environmental impact statement was a reasonable decision. As the district court noted, Phase II does not constitute a radical departure from the surrounding business area. Located outside the Vieux Carre district, squarely within the Central Business District, Phase II is within the immediate vicinity of the Sheraton and Marriott Hotels which rise well above Phase II. Moreover, Phase I, already in place beside Phase II, is more than 100 feet higher than Phase II. Whatever the visual impact on the Vieux Carre--positive or negative--the City's reasonable conclusion that it would be "minimal" is perhaps best explained by the testimony of a member of the Advisory Council that the building would hardly be visible at all from within the French Quarter:
 
 
 45
 I was not able to see the 32-story Phase I tower from any perspective unless I got within a block, inside of a block of the Vieux Carre. And I will say, however, at one point, standing up on top of a fire hydrant, I was able to see the top of a structure.
 
 
 46
 See Final Environmental Assessment at 185. While the plaintiffs' experts might disagree with the City's conclusion, there is no basis for argument that it was unreasonable. The City also gave extensive consideration to the traffic consequences of Phase II, and we affirm the district court's finding that "plaintiffs present no evidence suggesting that the City is not taking a hard look at the traffic implications, ...." Certainly, the City's finding is not unreasonable. See Save Our Wetlands, Inc. v. Sands, 711 F.2d at 644.
 
 
 47
 C. The City's Consideration of Mitigating Alternatives
 
 
 48
 Appellants maintain that the city failed to mitigate and consider alternatives to Phase II as required under federal legislation. NEPA requires the federal agency (or grant applicant) to consider "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. Sec. 4332(C)(ii). The implementing regulations relative to UDAG grants further require consideration of "ways in which the project or external factors relating to the project could be modified in order to eliminate or minimize any adverse environmental impacts and enhance environmental quality." 24 C.F.R. Sec. 58.15(c)(1).
 
 
 49
 Recognizing the sensitive character of the Vieux Carre historic district, Canal Place 2,000 and the City worked together to insure that the Phase II structures would be as aesthetically compatible as possible with the adjacent Vieux Carre properties. In order to maintain a harmonious height relationship with existing structures across North Peters and Ibberville Streets, Phase II was partially set back from the lot line; at the lot line facade heights were limited to those of the structures across the street. These modifications prevented a sharp visual contrast at the street level and provided a gradual transition across architectural styles. Additionally, the facing of the Phase II building, which was originally to have been the same "high tech" material that covers the existing Phase I office building, was changed to masonry to blend more smoothly with existing masonry structures. Clearly, the City considered the possible environmental ramifications of Phase II and undertook all reasonable methods of limiting and mitigating any adverse environmental effects.
 
 
 50
 Plaintiff's overriding concern about traffic flow was also addressed, and the problem was ameliorated by careful planning. Extensive studies were undertaken by the City and Canal Place 2,000 to provide for the efficient flow of vehicular traffic. The design and construction of an internal circular roadway with UDAG funds insures that the vast majority of vehicles will use Canal Street and the traffic will thus be routed away from the Vieux Carre. In addition to the foregoing, amenities were provided to enhance the environment for Phase II as well as nearby Vieux Carre pedestrians. One mini-park will be located on the Canal Street frontage. A major arcade will join Canal and Ibberville Streets through the center of Phase II, and the elevated pedestrian walkway will enable pedestrians to avoid crossing the circulating roadway and the L & N railroad tracks.
 
 
 51
 These measures clearly satisfy the requirements of NEPA. The measures will not only mitigate any potential adverse impacts but will also enhance an area that was formerly a picture of urban blight and badly in need of the stimulus for restoration that Canal Place will provide.
 
 
 52
 Appellants also maintain that the district court erred by concluding that the City and Canal Place 2,000 had complied with NHPA requirements. The National Historic Preservation Act, 16 U.S.C. Sec. 470, et seq., was enacted in 1966 to encourage the preservation of historic properties. The Act authorized the Secretary of Interior to maintain a national register of districts, sites, building structures, and objects significant in American history, architecture, archeology and culture. Because Canal Place, Phase II is being constructed in a National Historical Landmark District registered with the Secretary of Interior and is adjacent to the Vieux Carre, a national historic landmark, the City, as HUD's authorized delegate, was required to "take into account the effect of the [project]" on historic properties and to afford the Advisory Council on Historic Preservation an opportunity to comment on the project before approving the expenditure of federal funds. 16 U.S.C. Sec. 470f. Additionally, in 1980, Congress amended the Act, adding section 110(f), which further requires an agency to "undertake such planning and actions as may be necessary to minimize harm to such landmark" to the maximum extent possible. Federal regulations also have been promulgated to guide the historic preservation review process, including consultation with the SHPO and an opportunity to comment by the Advisory Council. 36 C.F.R. Sec. 800, et seq.
 
 
 53
 The City's historic preservation review began in early 1981 when the SHPO and his staff reviewed the project, made site visits, and consulted with various concerned agencies. The SHPO agreed that Phase II would have no adverse effects on the Vieux Carre: "Primarily the fact that its height was acceptable, and--and on a scale that wouldn't, we felt--wouldn't have no adverse effect from the Vieux Carre. And also that the traffic pattern there is planned in such manner that this would not cause any more congestion on Decatur." Appellee's Exhibit 76, at 17-18.
 
 
 54
 In accordance with guidelines promulgated by the Council on Environmental Quality (CEQ), the City submitted to the Advisory Council its determination of no adverse effect on national register or eligible properties. In order to ensure that the City had undertaken planning and actions to avoid or mitigate adverse effects of the Canal Place, Phase II development on the Vieux Carre to the maximum extent possible, the Advisory Council reviewed the determination of the Advisory Council chairman and convened a five-member panel for a public meeting in New Orleans on September 1 and 2, 1981. The Advisory Council's detailed recommendations and findings recommend that HUD grant final approval of the UDAG.
 
 
 55
 Appellants do not dispute the Advisory Council's conclusion. Instead, they argue that the historic preservation review should have included future phases of Canal Place. However, as we have noted previously, the City properly limited its consideration to Phase II. Future indefinite phases of Canal Place were simply not susceptible to environmental and historic review. Appellants also urged that the City should have reduced the size of the project. However, the City rejected this alternative as insufficient to achieve its economic objectives. As the district court noted, the administrative record does reveal significant efforts to mitigate any adverse effects on historic sites, including design changes. Moreover, as we have seen, many existing structures will tower over Phase II in its final form. Nothing in the record reflects that the City's decision that further limitation of the height was economically unfeasible is unreasonable. The district court did not err when it concluded that the requirements of the NHPA had been met for Phase II.
 
 
 56
 D. The City's Environmental Assessment Satisfies the Requirements of NEPA
 
 
 57
 Appellants contend that the City's environmental assessment was defective, since it allegedly inadequately treats several factors and does not constitute a "hard look" at the environmental consequences as required by NEPA. As noted above, NEPA directs that an environmental impact statement be included in every "recommendation or report on ... major federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(C). The proper procedural vehicle for such a determination is an environmental assessment, which provides a reviewable record of the agency's basis for its conclusions.
 
 
 58
 Among the City's first actions in the review process was the presentation of UDAG project plans in the two public meetings on January 28, 1981 and February 24, 1981. Additionally, the City consulted with the Office of the Mayor, the New Orleans City Council, the Louisiana Department of Community Affairs, the Regional Planning Commission, the Louisiana Office of Environmental Affairs, the Louisiana Department of Commerce, the Louisiana Department of Culture, Recreation and Tourism and the Planning Advisory Committee, which represents forty-three other agencies. Another presentation of the UDAG project was made to the Vieux Carre Commission on May 21, 1981, and at a second hearing approximately two months later, the Commission approved the UDAG-funded relocation of powerlines into the Vieux Carre.
 
 
 59
 In fact, in order to ensure a fair and informed preliminary decision regarding the "significance" of the proposed action, the City reviewed the same factors that would be studied in depth for preparation of a detailed environmental impact statement under NEPA. The findings on these factors, which evolved out of the City's extensive studies, consultations and hearings, are summarized in its Final Environmental Assessment, which closely parallels a detailed environmental impact statement in form and content.
 
 
 60
 Beginning with a description of the proposed action at pages 8 through 11, the Final Environmental Assessment listed the developer's objectives and addressed both the purpose and need for the UDAG project. There follows a description of the affected environment, from geology to socioeconomic conditions. In section 3, the environmental impact of the proposed actions are considered at length and detailed conclusions are drawn concerning the environmental impacts.
 
 
 61
 Subsequent sections address mitigating measures in the proposed action, the relationship between local and short term uses and long term productivity, irreversible and irretrievable commitments of resources, and alternatives to the proposed action. In conclusion, the Final Environmental Assessment sets forth the City's finding that "this project does not constitute an action having a significant impact on the human environment. Extensive appendices and a supplement to the assessment add further documentation, studies, reports, public and agency comments on the project, responses thereto and a full transcript of the Advisory Council's panel deliberations on September 2, 1981.
 
 
 62
 Not only did the City "consider" every environmental concern raised by the plaintiffs, it took a "hard look" at these factors and many more. Environmentally protective objectives reflected in the Final Environmental Assessment and the procedures followed in its preparation were extremely thorough and resulted in a document much akin to a detailed environmental impact statement. At the very least, the Final Environmental Assessment demonstrates that all procedural requirements of NEPA and NHPA were met and that the City's ultimate conclusion of "no significant impact" rests on a strong factual foundation reached pursuant to deliberate, detailed, and informed decision-making. Undoubtedly, the City took a "hard look" at the project's environmental consequences and none of the City's conclusions are unreasonable. Nothing more is required under existing precedent. See Environmental Defense Fund v. Marsh, 651 F.2d 983 (5th Cir.1981).
 
 III. Conclusion
 
 63
 The record convincingly demonstrates that the City undertook the responsibilities placed upon it under NEPA and NHPA with great diligence and properly considered the environmental and historic ramifications of Phase II. No contested material fact exists concerning the City's compliance with NEPA and NHPA. Accordingly, the district court's granting of summary judgment in favor of the City and Canal Place 2,000 is affirmed.
 
 
 64
 AFFIRMED.
 
 
 
 *
 District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 Although the plaintiffs contended originally that Phases III, IV and V were destined to be built in the near future, they now concede that Phase IV is too speculative and indefinite in nature to be considered in this proceeding. Nevertheless, plaintiffs still contend that Phases III and V should have been considered by the City during its environmental and historic review. See Part II, section A, infra