651 F.2d 983
 16 ERC 1233, 11 Envtl. L. Rep. 21,012
 ENVIRONMENTAL DEFENSE FUND and Louisville & Nashville
Railroad Company, Plaintiffs-Appellants,
and
National Audubon Society, et al., Plaintiffs-Intervenors-Appellants,
v.
John O. MARSH, Jr., et al., Defendants-Appellees,
and
Tennessee-Tombigbee Waterway Development Authority, et al.,
Defendants- Intervenors-Appellees.
 No. 80-3915.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit A
 July 13, 1981.
 Jon T. Brown, Stephen E. Roady, Robert N. Steinwurtzel, Washington, D. C., Joseph L. Lenihan, Louisville, Ky., James T. B. Tripp, New York City, for plaintiffs-appellants.
 Lawrence A. G. Moloney, Richard A. Fine, Marta W. Berkley, Civ. Div., Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for defendants-appellees.
 James Hugh Ray, Tupelo, Miss., Hunter M. Gholson, Columbus, Miss., Alfred P. Holmes, Jr., Mobile, Ala., for defendants-intervenors-appellees.
 Appeal from the United States District Court for the Northern District of Mississippi.
 Before SKELTON*, Senior Judge, and RUBIN and REAVLEY, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 The Environmental Defense Fund and other plaintiffs brought suit against John O. Marsh, Jr., in his capacity as Secretary of the Army, based on the claim that the Army Corps of Engineers has violated several statutes and regulations in the course of planning and constructing a major water project, the Tennessee-Tombigbee Waterway. The district court granted the government's motion for summary judgment, and the plaintiffs appealed. We affirm in part and reverse in part.
 
 I. The Background Facts
 
 2
 A. The History and Design of the TTW Before 1971
 
 
 3
 The Tennessee-Tombigbee Waterway ("the TTW") is a major navigational project of the Army Corps of Engineers ("the Corps"). The TTW extends 253 miles across portions of the states of Mississippi and Alabama to serve as a link between the Tennessee River in the north and an existing waterway to the south, the Black Warrier-Tombigbee Waterway ("BWTW"), which leads into the tidewater port of Mobile, Alabama. The TTW will thus be the completing link of a continuous waterway from the Tennessee, upper Mississippi, and Ohio Valleys to the Gulf of Mexico. The territorial limits of the TTW itself, however, extend only northward from Demopolis, Alabama (the northern terminus of the BWTW), to Pickwick Pool in the Tennessee River, near the common border of Tennessee, Alabama, and Mississippi. The TTW was first authorized by Congress in 1946, but essentially lay dormant until 1965, when Congress authorized a re-evaluation of the economics of the project.[1] Consequently, the Corps' district engineer at Mobile completed an economic re-study of the TTW on June 30, 1966 ("the 1966 study").
 
 
 4
 After public comment based on the 1966 study, the Secretary submitted a proposal to Congress in 1969 that allocated funds for pre-construction planning of the TTW. In 1971, the Corps prepared and filed an environmental impact statement ("EIS") that was also based on the 1966 study, pursuant to the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq. With that EIS before it, Congress appropriated the first funds for construction. 117 Cong.Rec. 28478-28488 (1971). See also, EDF v. Corps of Engineers, 492 F.2d 1123, 1140 (5th Cir. 1974). The EDF and the Committee for Leaving the Environment of America Natural ("CLEAN"), both plaintiffs in the present action, challenged the sufficiency of this EIS in 1971, but the district court upheld the EIS, and this court affirmed. EDF v. Corps of Engineers, 348 F.Supp. 916 (N.D.Miss.1972), aff'd, 492 F.2d 1123 (5th Cir. 1974) ("EDF I").
 
 
 5
 B. The Design and Economics of the TTW After 1971
 
 
 6
 Major construction projects usually change in design, cost, scope, and impact over the years required for development. In fact, the original EIS for the TTW anticipated major changes in the project and specifically stated that the EIS was only
 
 
 7
 the first of three phases of a comprehensive environmental study of the project area .... The second phase of the study will consist of a detailed evaluation of the impacts identified during the first phase and will be correlated with advanced engineering and design work for the project. Alterations in design will be made to increase the gains and mitigate the losses. In addition, the environmental statement will be updated prior to the construction of major segments of the project.
 
 
 8
 Environmental Statement, Tennessee-Tombigbee Waterway, p. 2 (March 1971) (emphasis added).
 
 
 9
 It is not important for the purposes of this case to trace the origin and motive behind each change in the design and economics of the TTW after the 1971 EIS was filed. But by late 1974, the Corps had initiated design changes costing about $330 million and inflation had added a like amount to project costs. As a result, the TTW was projected to cost more than three times the amount originally submitted to Congress. Faced with such grim statistics, the Corps decided to commission a new economic analysis of the waterway, which was published in 1976. That study ("the 1976 study") publicly revealed that the TTW would depart from the 1971 designs and economic projections in the following ways:
 
 
 10
 1) Traffic on the waterway in the initial year of operation will be 350% of the figure projected in 1971 (28 million tons as compared to 8 million tons), will move 90% from north to south (as compared to the former projection that 80% would move from south to north), and will carry a total of 18 million tons of coal (as compared to the former projection of 2 million tons);
 
 
 11
 2) Total land use for the project will be 150% of the figure projected in 1971 (105,000 acres as compared to 70,000 acres);
 
 
 12
 3) A 45-mile section of the canal has been changed in design from a "perched canal," created by artificial levees on both sides, to a "chain of lakes," using an artificial levee on one side and a natural barrier of hills on the other to create a larger body of navigable water, which will also serve as a better reservoir for locks. This design will allegedly flood an additional 5,000 acres and waterlog an additional 50,000 acres;
 
 
 13
 4) A navigation channel that originally was to follow the natural course of the Tombigbee River has been straightened by artificial cutoffs that will isolate 21 miles of the river's previous channel; and
 
 
 14
 5) Excavations in one section of the project will create the need for disposal of 9 million cubic yards more spoil than was projected in the 1971 EIS.
 
 
 15
 The design of the TTW was changed in one additional way after the 1976 study. Prior to 1975, the Corps had assumed that it could, without congressional authorization, remove certain barriers from the BWTW to accommodate two-way traffic from the larger 8-barge tows that the TTW will be able to carry.[2] A 1974 decision of the United States District Court for the District of Columbia, however, held that the Corps did not have authority to make such improvements without congressional authorization. Atchison, Topeka & Santa Fe RR Co. v. Callaway, 382 F.Supp. 610 (D.D.C.1974). See EDF v. Alexander, 467 F.Supp. 885, 896 n.5 (N.D.Miss.1979). Based on this ruling, the Corps decided in 1975 to sever the authorized TTW project and pursue the improvements to the BWTW as a separate project, which is still under study and has not been proposed to Congress. That segmentation decision was made public in the 1976 study. As a practical result, total long-distance traffic volume on the TTW will be limited by the 6-barge tows and slower speeds that the unimproved BWTW can currently accommodate, placing an effective traffic limit on the TTW of 29 million tons annually.[3] If and when the BWTW is improved, the TTW may eventually handle up to 55 million tons a year by 1995. Since 1976, the Corps has chosen to evaluate the cost-benefit ratio of the TTW on the basis of the 29 million ton limit, and all submissions to Congress have been based upon that limitation.
 
 
 16
 In spite of the express statement in the 1971 EIS that it would be updated prior to construction of any major segment, the Corps has not filed a supplemental EIS in relation to any of the changes discussed above. Because NEPA does not contain any explicit requirements for the supplementation of an EIS, the Corps believed that it was governed only by its own regulations in this matter.[4] At the time of these decisions, the Corps' regulations required the preparation of a supplemental EIS, involving all the formalities required of any EIS under NEPA,[5] in either of the following situations:
 
 
 17
 (1) If the final environmental statement previously filed clearly failed to comply with the requirements of NEPA: e. g. failed to discuss alternatives or failed to disclose the environmental impacts of the proposed action, or if there has been a major change in the plan of development or method of operation of the proposed action, (or)
 
 
 18
 (2) Whenever the final environmental statement on file becomes deficient because certain environmental effects of the project were not discussed or design features or project purposes were modified significantly subsequent to the filing of the original environmental statement.
 
 
 19
 33 C.F.R. § 209.410(g)(1) & (2).[6] But the same regulation allows the filing of a more informal document in relation to less significant changes:
 
 
 20
 (3) Whenever it is necessary only to clarify or amplify a point of concern raised after the final environmental statement was filed with CEQ (Council on Environmental Quality) (and such point of concern was considered in making the initial decision) or if comments on the final environmental statement are received from Federal, State or local governmental agencies or the public, the clarification, amplification or response to the comments received shall be prepared and filed with CEQ. No waiting periods are required....
 
 
 21
 33 C.F.R. § 209.410(g)(3).
 
 
 22
 The Corps chose to treat all post-1971 changes in the TTW under subsection (3), as "point(s) of concern ... considered in making the initial decision" but needing only "clarification" or "amplification." As a result, the Corps has filed 18 volumes of "supplemental environmental reports" ("SERs") with the CEQ. The SER is entirely an ad hoc creation of the Corps: its contents and the procedures accompanying its preparation and release are not governed by any statutes or regulations. Thus the Corps may include as much or as little environmental analysis, and allow as much or as little public comment, as it wishes.[7] The federal defendants rarely cited the SERs in their motions and memoranda relating to summary judgment on the environmental issues in this case, which leads us to believe that the SERs contain little substantive environmental analysis of the post-1971 changes.
 
 
 23
 Congress has continued to appropriate funds for the TTW, and the project is now about 55% complete. The waterway is currently expected to cost approximately $2 billion, of which about $800 million has already been spent. The improvements to the BWTW, still in the study and planning stage, are projected to cost an additional $1 billion.
 
 II. The Current Litigation
 
 24
 The plaintiffs filed this suit against the Corps in 1976, containing 15 counts. The district court divided these causes of action into three general sets of issues:
 
 
 25
 1) challenges to the legal authority of the Corps to build the TTW in light of the changes in the design and economic projections of the waterway;
 
 
 26
 2) the need for a supplemental EIS in relation to these changes; and
 
 
 27
 3) challenges to the Corps' method of calculating certain costs and benefits for the project.
 
 
 28
 The district court decided to try the first of these three issues separately.[8] Certain of the changes that the plaintiffs discussed in this first trial as a basis for negating the Corps' legal authority were public knowledge by the time of the 1971 EIS.[9] With regard to these pre-1971 changes, the district court held that the equitable doctrine of laches barred any challenge to the Corps' authority, and a panel of this court affirmed that judgment on appeal. EDF v. Alexander, 467 F.Supp. 885 (N.D.Miss.1979), aff'd, 614 F.2d 474 (5th Cir. 1980), cert. denied, 449 U.S. 919, 101 S.Ct. 316, 66 L.Ed.2d 146 (1980) ("EDF II"). But this first issue was also based upon some of the post-1971 changes listed in section I.B. above, most of which did not become public knowledge until the 1976 study was released. The district court recognized that an affirmative defense of laches would not apply to these changes and proceeded to the substantive legal issue. In deciding whether the post-1971 changes undermined the statutory authority of the Corps to construct the TTW, the district court found that several specific documents and regulations of the Corps establish a discretionary area within which Corps officials may make changes in congressionally-approved projects without securing Congress' approval. 467 F.Supp. at 899-902, 908-09. The district court evaluated the new chain-of-lakes design and the new straightening of the Tombigbee River channel in the light of these Corps documents and regulations, finding that these two changes were not so significant as to fall outside the discretionary area established by the Corps' policies. Id. at 909-10. This finding of the district court was not discussed in the Fifth Circuit opinion.
 
 
 29
 Following the trial and disposition on appeal of that first issue, both sets of parties filed motions for summary judgment or judgment on the pleadings in the two remaining sets of issues. Based on supporting memoranda and evidence submitted by the parties, the district court granted summary judgment or judgment on the pleadings to the federal defendants on all remaining counts except one, which is not at issue in this appeal. The court also issued a 63-page memorandum opinion in support of its judgment. EDF v. Alexander, 501 F.Supp. 742 (N.D.Miss.1980) ("EDF III"). The plaintiffs have chosen to appeal only four specific points, and we will discuss the reasoning of the district court on those four points in sections IV. through VII. below.
 
 III. The Standard of Review
 
 30
 A party who moves for summary judgment under Fed.R.Civ.P. 56 must meet an exacting standard: he bears the entire burden of demonstrating that there is no genuine dispute as to any material fact, and that he is entitled to judgment as a matter of law. In deciding such a motion, the trial court should view all evidence in the light most favorable to the party opposed to the motion. United States v. Hangar One, Inc., 563 F.2d 1155 (5th Cir. 1977). The court may not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists. Cole v. Chevron Chemical Co., 427 F.2d 390, 393 (5th Cir. 1970), cert. denied, 414 U.S. 858, 94 S.Ct. 67, 38 L.Ed.2d 109 (1973). The non-moving party is not required to respond unless and until the moving party has properly supported the motion with sufficient evidence, but he must then come forward with specific offers of evidence to present a material factual dispute. Adickes v. S. H. Kress and Company, 398 U.S. 144, 157-61, 90 S.Ct. 1598, 1608-10, 26 L.Ed.2d 142 (1970). The district court should base its decision on the pleadings, depositions, answers to interrogatories, admissions on file, affidavits, and any relevant evidence offered by the parties that would be admissible at trial. Fed.R.Civ.P. 56(c); 6 J. Moore Federal Practice P 56.11(1.-8) (2d ed. 1976). Because we have before us the same record that the trial court used to reach its conclusion, we apply the same legal standard in reviewing the district court's grant of summary judgment. United States Steel Corp. v. Darby, 516 F.2d 961, 963 (5th Cir. 1975).
 
 IV. The Need for a Supplemental EIS
 
 31
 As discussed in section I.B. above, the plaintiffs identified five general areas of change in the design and economic projections for the TTW that allegedly necessitate a supplemental EIS. NEPA itself does not contain any specific requirement for the supplementation of an EIS, and the federal defendants argue that this leaves the question to be determined only by the Corps' own regulations. We do not believe that NEPA should be read so narrowly, however, as to leave the need for supplementation of an EIS entirely up to the discretion of an agency. NEPA requires that
 
 
 32
 (A)ll agencies of the Federal government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on ... the environmental impact of the proposed action (and) ... any adverse environmental effects which cannot be avoided should the proposal be implemented ...."
 
 
 33
 42 U.S.C. § 4332. Even after the Corps has filed a formal EIS for a project, changes in the project at some point must be regarded as "major Federal action" so as to require an additional statement of environmental impact. The previous EIS might still be valid in relation to the aspects of the project that have not been changed; but if no added statement were made, the new elements would never have their environmental impact publicly analyzed. We therefore hold that NEPA does require the supplementation of an EIS when subsequent project changes can, in qualitative or quantitative terms, be classified as "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332. The standard of the need for an original EIS and of the need for a supplement to that EIS, therefore, is essentially the same; it merely focuses the inquiry on a different body of information to evaluate the "significance" of the environmental impact.
 
 
 34
 The Corps' own regulations require it to file a supplemental EIS at least when the original EIS becomes deficient, either because "environmental effects of the project were not discussed" or because of "significant modifications" to design features or project purposes. 33 C.F.R. § 209.410(g)(1) & (2).[10] The operative word in both the Corps' regulation and NEPA is "significant," a chameleon-like word that takes its functional meaning from its context. Here, the context is the environmental impact of an agency action. Thus the legal standard of the need for a supplemental EIS in this case, under either the Corps' regulation or NEPA, is whether the post-1971 changes in the TTW will have a "significant" impact upon the environment that has not previously been covered by the 1971 EIS. It is the initial responsibility of the Corps to apply this standard and decide whether or not a supplemental EIS is necessary. If a party affected by that decision challenges it in court and raises a "substantial environmental issue," the reviewing court should uphold the agency's decision only if it is reasonable, rather than use the deferential "substantial evidence" standard. Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 424-25 (5th Cir. 1973); Save Our Ten Acres v. Kreger, 472 F.2d 463, 466-67 (5th Cir. 1973). We now turn to the specific environmental issues raised by the plaintiff in this case.
 
 
 35
 A. The Changes in Traffic Levels, Directions, and Cargo
 
 
 36
 The 1976 study revealed for the first time that barge traffic in the first year would be 350% of the traffic projected in 1971, would move primarily in the opposite direction, and would carry nine times the amount of coal projected in 1971. The district court did not even mention these new projections in its discussion of post-1971 changes in the TTW. EDF III, 501 F.Supp. at 753. The government argues that the new level of traffic cannot be considered "significant" or new because the 1966 economic study, which served as the data base for the 1971 EIS, contained one chart that projected traffic at this level by the year 2010. But the 1971 EIS did not discuss the eventual impact of such a traffic level on the environment, much less the impact of that level if achieved in the first year. And it obviously could not have discussed the newly-discovered characteristics of the traffic.
 
 
 37
 The affidavit of the plaintiff's leading environmental expert states that these vastly greater traffic levels will have major new environmental impacts through increased turbidity, bank sloughing, congestion, and pollution. Other affidavits show that significant environmental impacts from this larger traffic level will also be felt along the course of the BWTW and in Mobile harbor, impacts on geographical areas that were entirely excluded from the 1971 EIS. The supervisory sanitary engineer in the Mobile district office of the Corps testified in deposition, and the federal defendants have not denied, that the Corps has made no studies to determine the environmental significance of these new traffic projections. Perhaps because of the lack of such studies, the federal defendants' motions and memoranda relating to summary judgment cite no evidence to indicate that these changes will not have significant effects upon the environment.
 
 
 38
 The only relevant argument advanced by the federal defendants is that the 1971 EIS addressed several categories of impacts that result from barge traffic, e. g., turbidity and bank sloughing. But only one of these general categories, the volume of water transfer between the Tennessee and Tombigbee Rivers, was analyzed in terms of the maximum volume of traffic, presumably the 29 million ton figure. All other environmental impacts related to traffic volume were discussed in the broadest generic terms, without being tied to any volume of traffic, not even the 8 million ton figure then projected for the first year. See excerpts printed at the end of EDF I, 467 F.Supp. at 942. The 1971 EIS thus provides no evidentiary basis for finding that a 250% increase in traffic in the initial year will not have significant environmental impacts. Even if the impacts of such traffic levels are qualitatively the same as was discussed in the 1971 EIS, the plaintiffs have offered to prove that they are quantitatively very different and very significant. The defendants made no counter offer of relevant evidence.[11]
 
 B. Increased Land Use
 
 39
 The district court did consider the 50% increase in land use as a change in the project, but found that
 
 
 40
 major sections ... will be unaffected by construction, and will not result in destruction of habitat. In other instances, additional lands were acquired to mitigate environmental impact (record citation omitted). Mere increase in the quantity of land for a project does not alone constitute a project change or basis for supplementing the EIS.
 
 
 41
 501 F.Supp. at 753. These findings are inadequate. First, the question is not whether "major sections" of the new acquisitions will not be affected by construction, but whether some sections will be significantly affected in environmental terms. Second, merely because some of the new land acquisitions may have been intended to "mitigate environmental impact" does not shield those acquisitions from review under NEPA and the Corps' own regulations. The proper question is not the intent behind the actions, but the significance of the new environmental impacts. And even if the Corps was correct in deciding that the new land use will be beneficial in impact, a beneficial impact must nevertheless be discussed in an EIS, so long as it is significant. NEPA is concerned with all significant environmental effects, not merely adverse ones. Hiram Clarke Civic Club, 476 F.2d at 424-25. Finally, the plaintiffs did not base their claim on a "mere increase in the quantity of land," but on allegations that the new land would be used in a way that had significant effects on the environment, which obviously could not have been addressed in the 1971 EIS. The affidavit of plaintiffs' environmental expert avers that at least some significant portion of the new land will be used for spoil disposal, and that conclusion is supported by a Corps memorandum, dated February 5, 1973, which was also part of the record. The plaintiffs also cited the federal defendants' answer to an interrogatory showing that substantial portions of the new land will be "destroyed or substantially modified," to use the Corps' own words.[12] In contrast, the federal defendants' motions and memoranda relating to summary judgment give us no evidence that the new land acquisitions and uses will avoid a significant environmental impact.
 
 C. The New "Chain-of-Lakes" Design
 
 42
 The district court found that there was no material factual dispute concerning the change from a "perched canal" to a "chain-of-lakes" design, even though the plaintiffs' leading environmental expert testified in deposition that the new design will flood 5,000 additional acres, waterlog an additional 50,000 acres, and create a very different set of environmental dynamics as compared to the previous design.[13] The court's finding was based on the following rationale:
 
 
 43
 Plainly, (the new design) was adopted because of its environmental and aesthetic advantages. Additionally, this court has specifically found that the chain-of-lakes design is not a significant change inasmuch as it does not necessitate acquisition of additional real estate and because the acreage to be inundated by the pools is lowland subject to periodic flooding under the original design. 467 F.Supp. at 910. This court also held that the chain-of-lakes concept "does not affect either the scope or purpose of the project, nor does it materially change the plan of improvement." Id.
 
 
 44
 501 F.Supp. at 753. The district court's reasoning may be summarized in two points: (1) the new design is intended to be environmentally superior, and (2) the 1979 trial on the Corps' legal authority previously determined that the design change was not significant.
 
 
 45
 The first point is an inadequate basis for summary judgment to the extent it is based only on the Corps' intent or belief in making the design change. Even if the Corps correctly decided that the design is superior in terms of overall environmental impact, that decision does not dispose of the material issue before the court: does the design have any significant new environmental impacts, whether beneficial or harmful? The original perched canal design may have been so problematic that the new flooding, waterlogging, and environmental dynamics of the chain-of-lakes design are a net improvement. But as discussed in section B. above, that improvement may still be significant for the purposes of NEPA, and it could not have been discussed in the 1971 EIS.
 
 
 46
 The second point in the district court's discussion is that the 1979 trial on legal authority found that the new design was not a "significant" change, and that any trial of this issue is, therefore, barred by res judicata. The court first repeats its earlier findings that the new design will not require additional land and will flood lowlands that are already subject to periodic flooding. Those findings relate to environmental impacts, but certainly do not dispose of all possible environmental impacts, or even address more than one of the specific impacts identified by the plaintiffs. The court then repeats the broader holding that the new design does not "materially change the plan of improvement," which does appear to be a complete disposition of any environmental claim. But the previous trial analyzed the significance of the new chain-of-lakes design only in terms of the Corps' regulations and policies requiring Congressional authorization after certain "material" or "significant" changes in projects. EDF II, 467 F.Supp. at 908-910. As discussed above, the word "significant" draws its meaning from its context, and what is "significant" to the environment may be entirely different from what is "significant" to the existence of legal authority. The district court itself recognized this distinction in a passage from the EDF II opinion:
 
 
 47
 Clearly a challenge based upon noncompliance with environmental laws presents a different cause of action than the issue of the Corps' lack of authority to construct a channel with dimensions in excess of statutory authorization.
 
 
 48
 467 F.Supp. at 904.
 
 
 49
 For this reason, we do not believe that the findings made in the legal authority trial finally determined the environmental issues in dispute in this case. If those findings had even discussed or enumerated significant environmental factors, we would be disposed to expand on the meaning of the court's holding and find it applicable to this environmental question. But the court had severed the current environmental issues from the authority issues in EDF II, and the court's brief discussion of the chain-of-lakes design in EDF II simply is not concerned with the significance of the new design's environmental impact. EDF II, 467 F.Supp. at 909-10. That is the critical issue in this case, and the holdings in EDF II, from whatever viewpoint, did not address it. The doctrine of res judicata does not apply.
 
 
 50
 We would indeed expect that testimony in the legal authority trial might have been relevant to show the environmental significance of the changes, and the federal defendants could have cited and submitted copies of such testimony to support their motion for summary judgment in this case. International Distribution Corp. v. American District Telegraph Company, 569 F.2d 136, 138 (D.C.Cir.1977). They did not choose to do so.
 
 
 51
 The plaintiffs presented specific expert testimony that the new design will have very significant new impacts upon the environment. The only response of the Corps was to make general reference to two documents, one by Corps staff and the other by outside consultants, concluding that the new design was superior in overall engineering and environmental terms. The federal defendants' motions and memoranda relating to summary judgment, therefore, do not cite any evidence to prove that the new design will not have the significant new environmental impacts alleged by the plaintiffs.
 
 D. Straightening of the Tombigbee River
 
 52
 The district court found that the previous trial on the Corps' legal authority had also resolved all factual dispute concerning the environmental significance of new cutoffs in the Tombigbee River Channel that will isolate 21 miles of the river's channel:
 
 
 53
 (T)his court has heretofore found as a fact that the cutoffs were justified from an engineering standpoint since the amount of excavation otherwise required under the Corps (sic) new bend-widening criteria would have been much greater, and the additional cutoffs "did not affect the scope, purpose or plan of improvement in any material way." (467 F.Supp. at 410).
 
 
 54
 501 F.Supp. at 753.
 
 
 55
 We must once again point out that the earlier trial did not address the issue that is relevant to the summary judgment motion. The cutoffs may well be justified from an engineering standpoint, and they may require less excavation than alternative measures,[14] but that does not, by itself, negate the significance of any new environmental impact from these cutoffs. Although the earlier finding from EDF II that the new cutoffs do not "affect the scope, purpose or plan of improvement in any material way" would be dispositive if it had been made in the context of an environmental analysis, it was made in the context of an engineering and legal authority analysis. EDF II, 467 F.Supp. at 410. As discussed in section C. above, the earlier trial simply did not address the specific question at issue in this case, and res judicata does not apply.
 
 
 56
 Turning to the offers of proof by the parties, we find that the plaintiffs cited specific testimony by an environmental expert that the new cutoffs are a major departure from the design envisioned in the 1971 EIS, will greatly increase loss of wildlife habitat, will adversely affect thousands of acres of land adjacent to the new cuts, and, depending upon how the Corps deals with the isolated sections of the former river, perhaps create thousands of acres of stagnant and eutrophic water. The federal defendants' motions and memoranda relating to summary judgment cited no evidence to indicate that these effects will not take place or that the environmental impacts will not be significant.E. Additional Spoil Disposal
 
 
 57
 The most extensive excavations in the entire TTW project will occur in northeast Mississippi, where the waterway will cut through a divide to a depth of about 175 feet. The 1971 EIS estimated that this divide cut would excavate 140 million cubic yards of spoil, out of 260 million cubic yards for the entire TTW. The Corps now estimates that the divide cut will excavate an additional 9 million cubic yards of spoil. The district court found that
 
 
 58
 measures respecting spoil disposal as set forth in the supplemental reports to the EIS are essentially those which were visualized by government witnesses in the 1972 trial, and that these disposal measures have proved to be environmentally sound. Additionally, the present reliable estimate of the quantity of all material to be excavated is not more than 6 1/2 of the amount of spoil projected in the 1972 EIS, and this increased amount may hardly be considered a significant new environmental impact.
 
 
 59
 EDF III, 501 F.Supp. at 753.
 
 
 60
 Here, the district court has used the correct legal standard and logical analysis. The 1971 EIS broadly outlined the possible and probable methods of spoil disposal, acknowledging that a final decision had not yet been made. This discussion was found to be sufficient in the 1972 trial, EDF I, 348 F.Supp. at 916, 492 F.2d at 1123, and the plaintiffs have not offered any proof that the disposal of the 9 million additional cubic yards will depart from the methods discussed at that time. And, although 9 million cubic yards is an enormous amount of spoil, it is not a significant amount when viewed in relation to the 260 million tons of spoil disposal already discussed in the 1971 EIS.[15] Thus the plaintiffs have not offered any evidence that the environmental impacts of this added spoil will significantly differ in either quantity or quality from those envisioned in the 1971 EIS, unlike all of the other post-1971 changes at issue in this case.
 
 Conclusion: Need for Supplemental EIS
 
 61
 In relation to all of the changes discussed above, the issue before the district court was the reasonableness of the Corps' decision that the changes, singly or cumulatively, would not have significant new environmental impacts and, therefore, would not necessitate a supplemental EIS under NEPA or 33 C.F.R. § 209.410(g)(1) or (2). The plaintiffs' motions and memoranda related to summary judgment cite specific expert testimony and other evidence, unanswered by the defendants, to prove that all of the changes except the increased spoil disposal will have new environmental impacts that are quite significant, in either qualitative or quantitative terms.
 
 
 62
 When we look to the reasonableness of the Corps' decision in light of the plaintiffs' evidence, we find no solid evidence that the Corps has ever asked the right question, much less answered it reasonably. The Corps offered only a single document that shed some light on the actual decision to file SERs under § 209l.401(g)(3) rather than a supplemental EIS under subsection (2). That document is a memorandum from the chief of the Corps' Office of Policy to the chief of the planning division in charge of the TTW. The memorandum seems merely to confirm some earlier decision to prepare SERs, and reveals only a single standard as the basis for that decision:
 
 
 63
 The facts to date clearly show, however, that no significant deviations have been discovered or actions taken which were not in the best interest of the natural environment in the project area. Therefore, no new EIS or supplementing statements need be prepared in accordance with the other paragraphs of Section 7 of the regulation (using a parallel citation to the Corps' internal version of § 209.410(g)).
 
 
 64
 Memorandum from Irwin Reisler dated May 12, 1975.[16] As discussed above, that is simply the wrong standard. NEPA requires the discussion of all significant environmental impacts, not just adverse ones. Hiram Clarke Civic Club, 476 F.2d at 426-27.
 
 
 65
 Moreover, even if the Corps had asked the right question, the record indicates that they had no evidence to reach a conclusion. The federal defendants' motions and memoranda related to summary judgment do not cite any evidence at all that these post-1971 changes will not have the significant environmental impacts alleged by the plaintiffs. At the very most, they question the absolute accuracy of a few of the plaintiffs' figures, without offering their own estimates or undermining the conclusion that the impacts are still significant. The district court had absolutely no basis to grant summary judgment for the federal defendants and should have granted summary judgment for the plaintiffs. We will discuss the appropriate remedy in section VIII. below.
 
 
 66
 V. The Segmentation of the TTW from the BWTW
 
 
 67
 The plaintiffs also appeal the holding of the district court that the Corps may legally segment the TTW project from the widening and improvements to the BWTW and not submit a supplementary EIS that covers the eventual improvements to the BWTW as well.
 
 
 68
 As discussed in section I.B. above, the Corps assumed until 1974 that it needed no Congressional authority to widen and improve the 200 foot wide BWTW to accommodate the large levels of traffic that the 300 foot wide TTW will feed into the smaller waterway. Accordingly, the 1971 EIS assumed sub silentio that the BWTW would eventually be widened, but never acknowledged the need for that work. The 8 million tons of annual traffic projected for the TTW in the 1971 EIS were well within the capacity of the BWTW, whether that waterway was improved or not. The Corps discovered in 1975, however, that the BWTW project would require separate authorization, and that the TTW would achieve annual traffic of 28 million tons in the first year. Faced with these new facts, the Corps made a practical decision: it separated the two projects, initiated economic studies of the BWTW improvements, and evaluated the TTW on the basis of the lower traffic levels that the BWTW can accommodate even if it is not widened. At some point and by some means that are not clear from this limited record, the Corps decided that the BWTW could accommodate maximum traffic made up predominantly of 6-barge tows, which would yield a maximum level for the BWTW of 29 million tons annually. Consequently, all relevant projections for the TTW since 1976 assume that it will carry no more than the 29 million tons that the BWTW can currently accommodate, even though the waterway could carry up to 55 million tons annually if the BWTW were widened and improved.
 
 
 69
 The problem here is that the plaintiffs have made specific offers of proof that the BWTW cannot, in fact, accommodate that 29 million ton level of traffic.[17] They thus argue that the vastly greater traffic now projected to use the TTW in its first years will "coerce" approval of the separate BWTW when it comes time to approve that separate project, in order to enable the TTW to carry the minimal level of traffic at which it is economically justified. Accordingly, the plaintiffs believe that the Corps must file an EIS that addresses the environmental impact of the entire TTW-BWTW project. This argument is based on an analogy to highway construction: in certain cases, federal agencies have segmented highway projects and attempted to file an EIS only in relation to a single segment. Reviewing courts have often found that the segments were actually a single project, that each segment was useless without the complete project, and that the entire highway must be evaluated in the EIS rather than allow a piecemeal approach. Ecology Center of Louisiana, Inc. v. Coleman, 515 F.2d 860 (5th Cir. 1975); Named Individual Members of San Antonio Conservation Society v. Texas Highway Dep't., 446 F.2d 1013 (5th Cir. 1971). See also Swain v. Brinegar, 542 F.2d 364 (7th Cir. 1976); Indian Lookout Alliance v. Volpe, 484 F.2d 11 (8th Cir. 1973).
 
 
 70
 The district court found that the 1971 EIS had assumed that the BWTW would be improved and widened. Most of the plaintiffs in this suit were parties to the 1972 suit in which the 1971 EIS won full approval under NEPA. EDF I, 348 F.Supp. at 920. The district court thus concluded that any question about the need for an EIS addressed to the widening and improvement of the BWTW was barred by res judicata (because the 1972 trial could have litigated that issue) or the equitable doctrine of laches (because the plaintiffs had notice of this claim in 1971 but did not file until 1976), although the exact basis of the court's holding is not clear.
 
 
 71
 As an alternative holding, the district court found that the Corps is not required to file an EIS until it "makes a recommendation or report on a proposal for federal action," quoting Aberdeen Rockfish R. Co. v. SCRAP, 422 U.S. 289, 320, 95 S.Ct. 2336, 2356, 45 L.Ed.2d 191 (1975). See also Kleppe v. Sierra Club, 427 U.S. 390, 406, 96 S.Ct. 2718, 2725, 49 L.Ed.2d 576 (1976). The district court found that there was no proposal for federal action on the BWTW, and, therefore, no need to file an EIS addressed to that project.
 
 
 72
 Although we have some doubts that res judicata or the doctrine of laches apply to this issue,[18] we agree that no proposal has been made for action on the BWTW. Preparatory designs and studies are still under way, and will not be completed until 1984. Given that conclusion, the Supreme Court's opinion in Kleppe clearly indicates that NEPA does not require the filing of an EIS for the BWTW at this time. 427 U.S. at 408-15, 96 S.Ct. at 2729-33. The highway cases cited by the plaintiffs were either decided prior to Kleppe or were based upon a specific regulation of the Federal Highway Administration setting standards for highway segmentation. See, e. g., Swain, 542 F.2d at 368, 370. In addition, many of these highway cases involved two segments that were both proposed actions, and Kleppe allows a court to prohibit segmentation of proposed actions that have "cumulative or synergistic environmental impact."[19] 427 U.S. at 410, 96 S.Ct. at 2730. But we are here dealing with two projects that are historically distinct, one of which is proposed and the other still in the process of study and design. In that situation, NEPA does not yet require the Corps to evaluate the environmental impact of the BWTW.[20]VI. Review of Cost-Benefit Ratio
 
 
 73
 Several statutes and regulations set out standards for the Corps to use in the computation of cost-benefit ratios ("CBRs") for navigation projects.[21] The primary, and perhaps exclusive, purpose of most of these statutes and regulations is to provide the Corps and Congress with accurate data to evaluate the economic efficiency of navigation projects. The plaintiffs challenged the accuracy of the CBRs computed for the TTW and submitted to Congress since the 1976 study, alleging that more than 60% of the navigation benefits are illusory, that several of the most significant traffic movements are impossible, and that the BWTW cannot accommodate the assumed levels of traffic flowing from the TTW.[22] The district court found that a material factual dispute existed in relation to this issue. EDF III, 501 F.Supp. at 756.
 
 
 74
 The district court again applied the doctrine of res judicata to this claim because the 1972 suit had determined that one of the relevant statutes, 33 U.S.C. § 701a, did not allow judicial review of CBRs prepared solely for congressional action, relying upon Oklahoma ex rel. Phillips v. Guy Atkinson Co., 313 U.S. 508, 527-28, 61 S.Ct. 1050, 1060-61, 85 L.Ed. 1487 (1940). EDF I, 348 F.Supp. at 924-25. The district court reasoned that all of the other statutes raised by the plaintiffs in this 1976 lawsuit were enacted by 1971 and thus could have been raised in the 1972 suit that disposed of the § 701a claim. On that basis, the district court found that res judicata barred consideration of whether any of these statutes create a right of judicial review of the CBRs prepared thereunder.
 
 
 75
 This court specifically considered the 1972 holding of the district court in relation to § 701a. EDF I, 492 F.2d at 1134. We read our opinion in that case as re-opening the issue whether CBRs computed pursuant to § 701a are subject to judicial review. The opinion noted that Phillips was decided prior to the enactment of the Administrative Procedure Act and NEPA, and that those two statutes might create a right to judicial review of an agency's CRB computations. We avoided resolution of that question under the APA, however, by finding that NEPA subsumed any rights that might exist under § 701a and the APA:
 
 
 76
 (Because) NEPA requires a more comprehensive and pervasive weighing of costs and benefits than Section 701a contemplates, whatever rights may exist under that statute have been subsumed by NEPA insofar as our review of the Tennessee-Tombigbee project is concerned.
 
 
 77
 EDF I, 492 F.2d at 1134. EDF I thus recognized a limited right of judicial review of CBR computations under NEPA[23] and left open the question whether the APA might create a right of review of CBRs computed under various other statutes and regulations. See also Sierra Club v. Callaway, 499 F.2d 982, 991-92 (5th Cir. 1974).
 
 
 78
 The plaintiffs have based their appeal of this issue entirely on the argument that our opinion in South Louisiana Environmental Council, Inc. v. Sand, 629 F.2d 1005, 1012-15 (5th Cir. 1980), created a general right to judicial review of CBRs. A moderately attentive reader of our opinion in that case, however, would readily perceive that Sand approved judicial review of CBRs only when that review was based upon NEPA. Id. Sand thus went no further than this court had already gone in EDF I, 492 F.2d at 1134, 1138-41. But the plaintiffs here cannot justify any review under NEPA because they challenge only those CBRs prepared since 1975, which have never appeared in any EIS. The plaintiffs will be free to challenge these CBRs to the extent they are incorporated into the supplemental EIS that we order the Corps to prepare in section VIII. below.
 
 
 79
 As for any right to review under the numerous other statutes and regulations raised by the plaintiffs below, the district court briefly discussed these statutes and regulations and found that each one was intended merely to govern preparation of information for the benefit of Congress. On that basis, the court held that there was no right of judicial review of such CBRs under these statutes. EDF III, 501 F.Supp. at 756-58. In their briefs and oral argument before this court, the plaintiffs have not challenged any aspect of these specific holdings of the district court. They are, therefore, not before us on appeal and we specifically decline to affirm them as being the law in this circuit.
 
 VII. Local Assurances of Support
 
 80
 The final issue raised on appeal is whether the Corps complied with certain statutory requirements concerning the form of assurances given by state and local agencies that non-federal portions of project costs would be paid.
 
 A. Compliance with 42 U.S.C. § 1962d-17(b)
 
 81
 The Water Resources Development Act of 1974 ("WRDA"), 42 U.S.C. § 1962d-17(a), specifies the interest rate to be used to compute costs for navigation projects such as the TTW. The latest published rate is 7 1/8, 18 C.F.R. § 704.39, but the Corps has used the much lower rate of 3 1/4 for the TTW by claiming coverage under a "grandfather clause" exemption contained in § 1962d-17(b). That subsection allows the use of the lower interest rate for any project authorized before January 3, 1969, "if the appropriate non-Federal interests have, prior to December 31, 1969, given satisfactory assurances to pay the required non-Federal share of project costs ...." The TTW was authorized well before January 3, 1969. Thus it is proper for the Corps to use the lower interest rate if the appropriate state and local agencies gave "satisfactory assurances" before December 31, 1969, of their obligations to acquire real estate and alter highways, bridges, utilities, etc., as required for the waterway construction.
 
 
 82
 The district court noted that the authorizing statute for the TTW, Pub.L.79-525, 60 Stat. 634 (1946), incorporated House Document No. 486, which reads as follows:
 
 
 83
 The Board therefore recommends that the United States undertake the construction of a waterway ... subject to the condition that local interests give assurances satisfactory to the Secretary of War that they will:(a) Make and maintain at their expense alterations as required in highways and highway bridges and in sewer, water supply, and drainage facilities.
 
 
 84
 (b) Provide and maintain at their expense as required suitable and adequate river and canal terminals in accordance with plans approved by the Secretary of War and the Chief of Engineers.
 
 
 85
 House Document No. 486, pp. 55-56 (emphasis added). The district court then reasoned that the language "assurances satisfactory to the Secretary of War"[24] indicated the intent of Congress to commit that decision entirely to the discretion of the Secretary. Because § 701 of the APA, 5 U.S.C. § 701(a)(2), excludes from judicial review agency actions that are "committed to agency discretion by law," the district court concluded that the Secretary's decision was not reviewable. 501 F.Supp. at 763-64.
 
 
 86
 The district court omitted one critical logical step from this analysis: neither the district court nor the federal defendants cited any indication that House Document 486, written in 1946, was intended to define the term "satisfactory assurances" as used in § 1962d-17(b) of the WRDA, which was enacted in 1974 and is the statute relevant to this issue. We can identify no connection between the two statutes. It defies logic to argue that Congress intended the general statute of 1974 to be defined or limited by the use of a parallel term in the authorization for a single water project nearly thirty years earlier.
 
 
 87
 Having found the district court's holding to be unsupported, we must return to the original question of law: may the plaintiffs challenge the Corps' acceptance of local assurances and consequent use of the lower interest rate under § 1962d-17(b)? The defendants argue that the term "satisfactory assurances" is so broad that it evidences a Congressional intent to commit any decision as to the adequacy of such assurances to the agency's discretion. Because the APA excludes from judicial review any action "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), the federal defendants conclude that we may not review their compliance with the WRDA. Even if we accepted the Corps' reading of § 1962d-17(b), we would still be able to review whether some responsible Corps' official had, in fact, fulfilled his statutory duty to decide that the local assurances were "satisfactory," no matter how discretionary that decision.
 
 
 88
 But we also note that the Corps has enacted an internal regulation, Engineer Regulation 405-2-680, that sets very specific standards for the adequacy of local assurances concerning necessary real estate acquisitions. The regulation also requires the district engineer in charge of the relevant project to make specific decisions on the basis of written instruments.[25] The Corps is bound "not only by the precepts of its governing statute but also by those incorporated in its own regulations." Nader v. Nuclear Regulatory Commission, 513 F.2d 1045 (D.C.Cir.1975). See also Pacific Molasses Company v. FTC, 356 F.2d 386, 389-90 (5th Cir. 1966). The "agency discretion" exception to the APA is very narrow and should be limited to those situations where "statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820-21, 28 L.Ed.2d 136. An agency regulation may provide that "law to apply," Save the Bay, Inc. v. Administrator of E. P. A., 556 F.2d 1282, 1294 (5th Cir. 1977), and we find that ER 405-2-680 establishes such law at least in relation to some of the local assurances required under § 1962d-17(b).
 
 
 89
 There is also a question of the plaintiffs' standing to raise this issue. Before the district court went astray in its reliance upon House Document No. 486, it found that the plaintiff Louisville & Nashville Railroad Company ("L& N") had standing to raise the claim because it will be injured by the construction of the TTW, when substantial amounts of coal traffic will be diverted from the railway to the waterway. EDF III, 501 F.Supp. at 262-63. The federal defendants have not challenged this holding, but we believe that the standing issue deserves a closer examination before we proceed to the substantive question.
 
 
 90
 Because the WRDA establishes no specific right to judicial review of an agency action, the plaintiffs must establish standing under the general provisions of the APA. 5 U.S.C. § 702. For that purpose, the plaintiffs must allege some "injury in fact," and that the injury is " 'arguably within the zone of interests to be protected or regulated' by the statutes that the agencies (are) claimed to have violated." Sierra Club v. Morton, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972), quoting Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The Supreme Court has indicated that courts should not be austere in granting standing under the APA to challenge agency action taken pursuant to a statute. Id. at 154-55, 90 S.Ct. 830-31.
 
 
 91
 Economic injury from business competition created as an indirect consequence of agency actions can serve as the required "injury in fact," see Data Processing, 397 U.S. at 151-53, but it is arguable that the L&N's injury is not caused by the Corps' use of the lower interest rate under § 1962d-17(b), but by Congress' decision to build the TTW. That conclusion would destroy the L& N's standing for two reasons: the APA does not apply to actions of Congress and, more importantly, courts have traditionally refused to review the wisdom or accuracy of legislative decisions. Oklahoma ex rel. Phillips v. Guy Atkinson Co., 313 U.S. 508, 527, 61 S.Ct. 1050, 1060, 85 L.Ed. 1487 (1940). Many courts have extended this reasoning to deny judicial review of data, such as the Corps' cost-benefit ratio computations for a given project, that is prepared solely for the use of Congress in deciding whether to authorize the project or subsequently make annual appropriations. See, e. g., Izaak Walton League of America v. Marsh, 655 F.2d 346, 356 - 359 (D.C. Cir. 1981); EDF III, 501 F.Supp. at 756-57 and cases cited therein. These arguments apply with special force once Congress has actually authorized a project or appropriated funds based on specific CBR figures. That action makes Congress the ultimate decision-maker and removes the accuracy of the underlying data from subsequent judicial review. EDF I, 492 F.2d at 1138-41; Sand, 629 F.2d at 1013. If § 1962d-17(b) had no other effect than to determine the raw economic data that the Corps places before Congress, we would either deny the plaintiff standing to challenge the Corps' compliance or would hold the question to be not subject to judicial review.
 
 
 92
 But the plaintiffs have shown that the Corps' use of the lower interest rates under § 1962d-17(b) can have a broad and direct impact upon the way that the Corps treats the project and, ultimately, upon whether the Corps recommends further construction or not. The Corps' internal Engineer Regulation 11-2-240 requires it to classify a project with "doubtful or marginal economic justification" in a "deferred" status.[26] There is a significant possibility that the CBR for the TTW would drop below the level of economic justification if the Corps were required to use the higher interest rate mandated by § 1962d-17(a). Changes in the CBR may also force other post- authorization reviews of a project under other Corps regulations. See the discussion in Izaak Walton League, 655 F.2d at 359-360. It is unrealistic to believe that these Corps procedures and actions do not have a direct impact on the likelihood that a given project will be constructed. We thus hold that the L&N can be said to sustain some "injury in fact" from the Corps' internal use of a CBR that is alleged to be computed in violation of § 1962d-17(b), at least prior to congressional action based upon that specific CBR.[27]
 
 
 93
 Turning to the second element of standing under the APA, we find that the injury to the L&N is arguably within the zone of interests to be protected by the relevant statute. Section 1962d-17(c) makes specific reference to the congressional "statement of objectives" adopted in the Flood Control Act of 1970, 42 U.S.C. § 1962-2, which says that Congress intends planning and cost-benefit evaluation for federal water projects to be based on the following objectives: "enhancing regional economic development, the quality of the total environment, ... the well-being of the people of the United States, and the national economic development." This subsection of the WRDA also contains a directive to the President to make a complete study of the implementation of these same objectives and of "the interest rate formula to be used in evaluating and discounting future benefits for such projects, and appropriate Federal and non-Federal cost sharing for such projects." The President is directed to report the results of this study and any recommendations to Congress. 42 U.S.C. § 1962d-17(c). We find this language to be explicit evidence that Congress intends federal water projects to be governed in part by considerations of local economic development, such as the economic well-being of the L&N. Congress has also explicitly recognized that accurate cost-benefit analysis is an important element of that objective. The L&N thus has standing to challenge the Corps' compliance with § 1962d-17.[28] Accord, Concerned Citizens of Buck Hill Falls v. Grant, 537 F.2d 29, 33-36 (3rd Cir. 1976). But see Izaak Walton League, 655 F.2d at 356-360.[29]
 
 
 94
 The substantive question is considerably easier to dispose of. It is undisputed that the Corps did not comply with the specific requirements contained in ER 405-2-680.[30] In fact, the federal defendants' motions and memoranda on summary judgment have not offered the slightest evidence that any Corps official made the specific determination that the local assurances for the TTW were "satisfactory," under whatever standard or at whatever time. For that reason, we find that the Corps has not complied with the broader legal requirement contained in § 1962d-17(b) itself, regardless of ER 405-2-680.[31] Nor is any remedial action possible at this late date, since § 1962d-17(b) requires that the assurances be given before December 31, 1969. We order entry of summary judgment for the L&N on this issue and discuss the proper remedy in section VIII. below.[32]
 
 B. The Need for Written Assurances
 
 95
 The plaintiffs also raise a very brief challenge to the district court's finding that the Corps is not required to obtain written agreements of local support under § 221 of the Rivers and Harbors Act of 1970, 42 U.S.C. § 1962d-5b. That statute requires written agreements, but specifically exempts "any project the construction of which was commenced before January 1, 1972 ...." The district court noted that the Secretary of the Army had issued a Corps circular defining commencement of construction under this statute as "the first acquisition of real estate for the Project, or the execution of a construction contract, whichever occurs first." EC 1180-2-12. On that basis, the TTW construction began in August 1971, and is thus exempt from the requirement of § 221. The court found that the Secretary's interpretation of § 1962d-5b was reasonable and rejected two minor arguments also raised on appeal before this court. EDF III, 501 F.Supp. at 764-66. We agree with these findings of the district court in all particulars.
 
 VIII. The Appropriate Remedies
 
 96
 The parties have been of little assistance to us in proposing reasonable and proportionate remedies for the violations discussed above. The plaintiffs seek to enjoin construction of the entire TTW for the slightest infringement, while the federal defendants rarely even address the question of remedies.
 
 A. The Supplemental EIS
 
 97
 When a court has found that a party is in violation of NEPA, the remedy should be shaped so as to fulfill the objectives of the statute as closely as possible, consistent with the broader public interest. An injunction of the federal action at issue is often appropriate, but the injunction should be limited by general equity principles. One beneficial effect of such injunction is to maintain the status quo so that the relevant decision makers and the public may still have the opportunity to choose among alternatives, as required by NEPA. Another purpose is to provide the agency with an incentive to comply with NEPA in as rapid and thorough a manner as is reasonably possible. The court should tailor its relief to fit each particular case, balancing the environmental concerns of NEPA against the larger interests of society that might be adversely affected by an overly broad injunction. See State of Alaska v. Andrus, 580 F.2d 465 (D.C.Cir.1978), vacated in part on other grounds sub nom. Western Oil & Gas Association v. Alaska, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).
 
 
 98
 On the issue of the need for a supplemental EIS, we reverse the judgment of the district court and remand the cause for entry of summary judgment for the plaintiffs. The most important remedy available is that the Corps must immediately prepare a supplementary EIS covering all of the changes in the design and economic projections for the TTW that we have discussed in parts IV.A.-D. of this opinion. The EIS must comply with all the requirements of NEPA, both procedural and substantive.
 
 
 99
 In order to encourage rapid and thorough compliance with NEPA, it is appropriate to impose some injunctive remedy until a final supplemental EIS is filed. A blanket injunction of construction on the entire TTW is not justified, however, because the bulk of this project has been discussed in a valid EIS. The injunction that would most closely fit the Corps' specific violation of NEPA is one targeted directly at some of the major post-1971 changes in the TTW that will be discussed in the supplemental EIS. We therefore direct the trial court immediately to enjoin (1) the construction or letting of contracts on the chain-of-lakes segment and the cutoffs of the Tombigbee River channel, and (2) any activity significantly affecting the environment of the land acquisitions planned after 1971.[33]
 
 
 100
 The district court may allow specific exemptions from this injunction at the request of the Corps and after an evidentiary hearing. Such exemptions shall be granted only if the Corps demonstrates by a preponderance of the evidence that the public interest will suffer irreparable harm, but not based merely upon future increases in cost of construction. The district court shall retain jurisdiction pending the submission of a final supplemental EIS. At that time, the district court may issue whatever order it finds to be appropriate and consistent with this opinion.
 
 B. Correction of Interest Rates and CBRs
 
 101
 We have found that the Corps may not properly use the lower interest rate in CBR computations for the TTW, as provided in 42 U.S.C. § 1962d-17(b). We reverse the judgment of the district court and remand for entry of summary judgment for the L&N. Our holding is nevertheless limited by the rule that congressional action based upon a specific CBR forecloses judicial review of that CBR. EDF I, 492 F.2d at 1138-41; Sand, 629 F.2d at 1013. For that reason, we will not order the Corps to "correct" past submissions to Congress. But we can order the Corps to cease using the exemption provided in 42 U.S.C. § 1962d-17(b) for all relevant cost-benefit computations for the TTW.[34]
 
 IX. Conclusion
 
 102
 We are extremely reluctant to interfere with the construction of a project that Congress has authorized for the last ten years and that is now 55% complete. But the plaintiffs have established that the Corps has blatantly violated NEPA and its own regulations by refusing to prepare a supplemental EIS on the major changes in the Tennessee-Tombigbee Waterway that have occurred since 1971. Any layperson looking at a list of these changes would at once perceive that such major alterations could have significant environmental impacts. All the expert testimony offered by the parties has confirmed that lay judgment, and the Corps has been at an utter loss for evidence to justify its refusal to file a supplemental EIS. If the limited injunctive relief we have imposed seems harsh or late, the fault lies with the decision of the Corps to ignore its responsibility and to resist this lawsuit while continuing its default. We have discussed in notes 7 and 10, above, the Corps' new regulations governing the preparation of a supplemental EIS. 45 Fed.Reg. 56760 (1980) (to be codified 33 C.F.R. § 230). They embody what appears to be an accurate perception of NEPA's requirements, along with a genuine desire to implement the full spirit of that act. If that kind of clarity and intent had guided the Corps in its decisions for the Tennessee-Tombigbee Waterway from 1975 to 1979, this case would not have been necessary.
 
 
 103
 To briefly summarize our holdings, we reverse the district court's judgment as to the need for a supplemental EIS and remand with directions to enter summary judgment for the plaintiffs, except on the issue of additional spoil disposal, a holding which we join. We affirm the district court's judgment that the Corps does not yet need to file a comprehensive EIS addressed to future improvements on the Black Warrior-Tombigbee Waterway. On the issue of general statutory challenges to the cost-benefit ratios for the Tennessee-Tombigbee, we disapprove of the reasons given by the district court in denying relief, but the court's judgment stands on alternate grounds not challenged on appeal. Finally, we reverse the judgment that the plaintiff Louisville & Nashville Railroad may not obtain judicial review of the Corps' compliance with 42 U.S.C. § 1962d-17, and we direct entry of summary judgment for the plaintiff on that issue.
 
 
 104
 We direct the district court to impose a temporary injunction affecting certain segments of the waterway, pending the submission of a final supplemental EIS in accord with this opinion. The district court should retain jurisdiction of this cause until that document is submitted to the court, at which time the district court may enter a final order.
 
 
 105
 AFFIRMED IN PART and REVERSED IN PART.
 
 
 
 *
 Senior Judge of the United States Court of Claims, sitting by designation
 
 
 [1]
 For a complete description and history of the earlier TTW proposals, see EDF v. Alexander, 467 F.Supp. 885, 888-904 (N.D.Miss.1979)
 
 
 [2]
 Because of these barriers, the BWTW is effectively only 200 feet wide, as compared to the 300 foot width of the TTW. When that narrower width is factored with the greater sinuosity of the BWTW, barges must be shorter (no larger than 6-barge tows) and travel at slower speeds than will be possible on the new TTW
 
 
 [3]
 As discussed in section V. below, the plaintiffs contend that the BWTW cannot, in fact, accommodate traffic composed primarily of two-way 6-barge tows. If that allegation is true, then the maximum annual traffic on the BWTW and the TTW may be significantly less than the 29 million tons projected by the Corps, and the cost-effectiveness of the entire project could be undermined
 
 
 [4]
 The Council on Environmental Quality (CEQ) also has an advisory role in the interpretation of NEPA, so that the Corps would be guided by a relevant CEQ regulation. Hiram Clarke Civic Club, Inc. v. Lynn, 476 F.2d 421, 424 (5th Cir. 1973). The CEQ regulation from August 1, 1973 to July 30, 1979, was merely permissive in nature:
 An agency may at any time supplement or amend a draft or final environmental statement, particularly when substantial changes are made in the proposed action, or significant new information becomes available concerning its environmental aspects. In such cases the agency should consult with the Council with respect to the possible need for or desirability of recirculation of the statement for the appropriate period.
 
 
 [40]
 C.F.R. § 1500.11(b)
 In 1979 the CEQ promulgated a new regulation that requires a supplemental EIS if
 i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
 ii) There are significant new circumstances, or information relevant to environmental concerns and bearing on the proposed action or its impacts.
 
 
 [40]
 C.F.R. § 1502.9(c) (1979)
 The district court did not discuss the new CEQ regulation. Although the new regulation might be interpreted to impose a more rigorous standard for a supplemental EIS than the Corps' own regulations ("substantial changes ... relevant to environmental concerns" as opposed to changes that are "significant" in environmental terms), we will not apply this regulation because we find the Corps' actions inadequate even under its own regulations.
 
 
 [5]
 NEPA requires that an agency consult with and obtain the comments of other federal agencies having relevant jurisdiction or expertise, circulate copies of the EIS and accompanying comments to the President, the CEQ, and the public, and allow for public comment and response
 In addition, NEPA and the CEQ have specific guidelines for the contents of an EIS that, in general, would apply to a supplemental EIS as well. 42 U.S.C. § 4332.
 The point of allowing a supplement to an EIS is, of course, that the supplement need discuss only the new material and does not need to repeat the overall analysis conducted for the original EIS. Natural Resources Defense Council v. Callaway, 524 F.2d 79, 91-92 (5th Cir. 1975).
 
 
 [6]
 The Corps argues that subsection (1) is inapplicable to this case because it applies only to situations where the original EIS "clearly failed" to comply with NEPA, and the original EIS here has been found to be in full compliance with NEPA. EDF I, 492 F.2d at 1123. Such an interpretation seems logical at first glance, until one encounters the language "or if there has been a major change in the plan of development or method of operation of the proposed action." That phrase obviously carries this subsection beyond the question of the original adequacy of the first EIS
 
 
 [7]
 It is noteworthy that the Corps has recently abandoned this discretionary format and procedure. New Corps regulations require that, when the need for an EIS is in doubt, the Corps must prepare an environmental assessment ("EA"), a document that "provides sufficient information on potential environmental effects of the proposed action ... to the district engineer ... to determine if an EIS is required." The contents of an EA are set out with moderate specificity, and there are certain requirements for circulation and public availability. Based on the EA, the Corps' district engineer then either decides that an EIS is required or issues a "finding of no significant impact" ("FONSI"), explaining in some detail why an EIS was found not to be necessary. The contents, circulation requirements and public availability requirements for the FONSI are set out with great particularity and appear to be a model of agency responsiveness under NEPA. 45 Fed.Reg. 56760, 56763-64 (1980) (to be codified in 33 C.F.R. § 230)
 
 
 [8]
 The district court justified this severance on the ground that, if the Corps were found to lack legal authority, the remaining issues would be moot. EDF v. Alexander, 467 F.Supp. 885, 887-88 (N.D.Miss.1979) ("EDF II")
 
 
 [9]
 For instance, it was clear by 1971 that the Corps was planning a 300 foot width for the TTW, even though earlier designs and submissions to Congress had been based on a 200 foot width. EDF II, 467 F.Supp. at 888-904
 
 
 [10]
 The actual text is given in section I.B. above
 The Corps has recently published new regulations that substantially improve on the wording of § 209.410(g):
 A Supplement to the draft or final EIS will be prepared whenever significant impacts resulting from changes in the proposed plan or new significant impact information, criteria or circumstances relevant to environmental considerations impact on the recommended plan or proposed action as discussed in 40 CFR 1502.9(c).
 
 
 [45]
 Fed.Reg. 56760, 56764-65 (1980) (to be codified as 33 C.F.R. § 230)
 
 
 [11]
 It is as inconsistent as it is unconvincing for the Corps to argue that these broad discussions in the 1971 EIS adequately discuss the major design changes that have occurred since 1971. As discussed in section I.B. above, the 1971 EIS specifically promised that it would be updated to deal with subsequent design clarification and changes. The TTW is now 55% complete, the designs of the waterway are quite definite (some are, to use a very literal metaphor, set in concrete), traffic levels and characteristics have changed drastically, and yet the Corps admits it has made no studies of the resulting environmental impacts
 
 
 [12]
 The interrogatory asked the defendants to state, for each type of land given in a list, the number of acres that will be acquired and used for construction. The defendants answered as follows:
 The following acreages, by land types, will be destroyed or substantially modified by the project:
 Croplands 1,400 acres
Range or grazing land (includes
 pasture, fallow, and abandoned) 2,900 acres
Forest land 57,000 acres
Bottomland hardwood forest 36,000 acres
Uplands wildlife habitat 18,000 acres
Wetlands (including swamps) 3,000 acres
 NOTE: These categories are not mutually exclusive.
 The amounts listed by the federal defendants total 118,300 acres, more than the land use of the entire project. Obviously, some overlap is involved, but the figures offer further indications that substantial portions, if not all, of the new land will be significantly affected in environmental terms.
 
 
 [13]
 The expert offered specific testimony that the new lakes, unlike the previous canal, will create shallow bodies of water that will have lower current velocity, increased sedimentation, higher levels of rooted aquatic vegetation, and resulting low water quality
 
 
 [14]
 To clarify the district court's statement, the Corps issued new criteria for the widening of river bends in 1973. Thus the district court is not saying that the new cutoffs will require less excavation than was envisioned in the 1971 EIS, but only less excavation than would have been required if the Corps had followed the 1971 plan to use the natural river channel more extensively, while also observing the 1973 bend-widening criteria
 
 
 [15]
 When the additional spoil is related to the 260 million cubic yards required for the whole project, it represents an increase of only about 3.5%. The 6.5% figure mentioned by the district court came from dividing the 9 million cubic yards by the 140 million cubic yards excavated from the divide cut section alone
 If we did not take this relative view of the spoil's significance, projections for a large project like the TTW would need to have an impossible kind of pin-point accuracy in order to avoid the need for constant supplementation of the EIS. That would be an unreasonable requirement, and the accuracy and specificity required of an agency by NEPA are limited by the "rule of reason." EDF I, 492 F.2d at 1131.
 
 
 [16]
 The plaintiffs offered the only additional evidence as to how the Corps decided not to file an EIS. They cited passages from the depositions of Dr. C. Grant Ash, Chief of Environmental Development in the Corps' Office of Policy, Civil Works, and General Drake Wilson, district engineer in the Mobile district office, which supervised work on the TTW. Dr. Ash had ultimate responsibility for the preparation of the SERs related to the TTW to ensure that they complied with the relevant statutes and regulations. General Wilson supervised the preparation of the documents that made up the first SER in the Mobile office
 Dr. Ash first testified that the Corps did not prepare a document with the prior intent that it be either a SER or an EIS, but that his office would decide, after receiving a document, whether to file it as an EIS under § 209.410(g)(2) or as a SER under § 209.410(g)(3) (in the deposition testimony, the parties refer to subsection (2) as "7(b)" and to subsection (3) as "7(c)," using the parallel citations to the Corps' internal regulation covering the same matter, Engineer Regulation 1105-2-507). Dr. Ash then offered the following testimony:
 Q. In your application of the guidance as set forth in the Corps regulations, did you or anyone else, after you reviewed what came up from the field, and you were reviewing the reports, the supplemental reports, did you prepare or did anyone to your knowledge prepare any kind of a written statement saying, "I have looked at 7(b) and I have looked at 7(c) and I have read the reports, and in my opinion they should properly be filed under 7(c)," for whatever reasons?
 A. I sure didn't.
 Q. Did anyone else, to your knowledge?
 A. No, not to my knowledge.
 According to Dr. Ash, the decision to file a SER rather than an EIS was made at a meeting in the summer of 1975 between staff members from the Corps headquarters and the Mobile district office. The record does not discuss what transpired at that meeting.
 General Wilson gave the following testimony about the factors that motivated the decision: "We were concerned about whether we were going to reopen the opportunity for public review of the project .... And we wanted to file the supplemental information in a fashion which would not reopen it." Although it is not improper for the Corps to consider such practicalities, they should not be a motivating factor in choosing whether to file a SER or an EIS.
 
 
 [17]
 For example, the plaintiffs introduced an internal Corps memorandum containing the following data and conclusion:
 Comparison of the tow size distributions, shows that the average tow size on the BWT has increased from 3.0 barges per tow in 1971 to 3.5 barges per tow in 1974. The typical tow on the BWT in 1971 and 1974 is the 4-barge tow which can be accommodated in a single lockage by the existing 460- by 95-foot lock. This tow size mean appears to be used with increasing frequency as waterway commerce increases. The 6-barge tow (475-feet long by 105 feet wide) is also being used more frequently now than as compared to 1971. However, use of this size of tow requires a double lockage at Oliver and takes over three times the lockage time of a single lockage. Although the size of Oliver Lock poses a constraint on the use of the 6-barge tow, information developed from interviews with towing companies presently operating on the BWT indicates that other equally important factors also restrict the use of the larger tow size. Towing companies reportedly only utilize the 6-barge tow when the tail-water gage (sic) at Demopolis reads less than 28 feet. When a high water condition exists the use of the 6-barge tow is discontinued by the tow firms due to control difficulties when moving downstream and insufficient power to upbound tows. Hydrologic records from 1956 to 1972 show that a reading of 28 feet was equalled or exceeded 21 percent of the time. Other factors noted by the towing firms that hinder their use of 6-barge tows on the BWT include restrictive horizontal clearances on four bridges across the waterway and numerous sharp bends throughout the waterway. Based on the above information, we do not foresee substantial future increases in the use of the 6-barge tow.
 Corps Memorandum for the Record, Titled "Status Report on Study of Replacement of William Bacon Oliver Lock and Dam," dated February 12, 1976 (emphasis added).
 The record offers no evidence of how and when the Corps finally decided that the BWTW could accommodate maximum traffic made up predominantly of two-way 6-barge tows. The Corps simply told the outside consultants preparing the 1976 study to make such an assumption.
 
 
 [18]
 It is true that the 29 million ton figure was revealed in a single chart contained in the 1966 study, as a projection for the year 2010. But the 1971 EIS never mentioned that traffic figure or any eventual need for improvements to the BWTW. It is highly doubtful that the 1966 study received the kind of public exposure that would have placed the plaintiffs on notice of this cause of action. The relationship between the 29 million ton level of traffic and the imminent need for improvements to the BWTW, which is the very substance of this issue, was not brought before the public eye with any clarity until the 1976 study was published
 
 
 [19]
 We believe that Kleppe also leaves room for a court to prohibit segmentation or require a comprehensive EIS for two projects, even when one is not yet proposed, if an agency has egregiously or arbitrarily violated the underlying purpose of NEPA. For instance, in Named Individual Members, 446 F.2d at 1013, the Department of Transportation arbitrarily segmented a single highway project to allow construction of two "end segments" leading up to the very borders of a treasured city park, supposedly postponing the "middle segment" for "further study." Construction of the two end segments would have effectively eliminated any alternatives to using park land for the middle segment. The opinion does not clearly indicate whether the middle segment was a "proposed action," but the agency could easily enough have structured the transaction so that it was not. We do not believe that Kleppe should prevent a court from implementing an appropriate remedy in a similar case, and our holding in this case should not be read as supporting an absolute view of Kleppe. The facts alleged by the plaintiffs here, even if they are true, simply do not amount to the kind of arbitrary or egregious violation of NEPA's underlying purpose that we found in Named Individual Members
 
 
 [20]
 This issue and all remaining issues in the case are essentially challenges to the accuracy of the cost-benefit ratios that the Corps has submitted to Congress since the publication of the 1976 study. On all but one of these issues, we find that the plaintiffs may not raise such challenges in federal court at this time, even though several of their points may have merit
 The supplementary EIS that we require in section VIII. below, however, will provide the plaintiffs with an opportunity to raise all of these issues under NEPA. For instance, the supplementary EIS will of necessity contain an analysis of the impact of the 29 million ton level of traffic on the BWTW and Mobile harbor, because no EIS has ever addressed that question, and it is obviously a significant new environmental impact. The plaintiffs may also challenge the accuracy of the CBRs themselves, at least to the extent they are incorporated into the EIS and might distort the ability of readers to make a "reasoned evaluation and decision." Sierra Club v. Morton, 510 F.2d 813, 827 (5th Cir. 1975). See also South Louisiana Environmental Council, Inc. v. Sand, 629 F.2d 1005, 1012-13 (5th Cir. 1980).
 
 
 [21]
 The plaintiffs have not offered us a list of the statutes and regulations that they rely upon in this issue, and we have difficulty in compiling a consistent list from their complaints and summary judgment motions before the district court. We will, therefore, use the list set out in the federal defendants' brief:
 Water Resources Planning Act of 1965, 42 USC § 1962a et seq.; Department of Transportation Act of 1966, 49 USC § 1646a; 33 USC § 701-1; Policies, Standards, and Procedures in the Formulation, Evaluation, and Review of Plans for Use and Development of Water and Related Land Resources, Sen. Doc. No. 97, 87th Cong., 2d Sess. (1962); Principles and Standards for Planning Water and Related Land Resources, 28 Fed.Reg. 24778 (September 10, 1973); Corps Regulations ER 1165-2-6, ER 1120-2-114, ER 11-2-240; Corps Engineering Manual EM 1120-2-101.
 
 
 [22]
 On the third of these allegations, see the discussion in section V. above, especially at note 17
 The district court noted that the plaintiffs and other parties have extensively aired these claims before Congress. EDF III, 501 F.Supp. at 758-59 and note 23.
 
 
 [23]
 The limits of that review are set by the requirements and purposes of NEPA: the EIS must contain enough information about a project's economic benefits to allow "the decision maker and other readers enough detail concerning all of these costs and benefits to permit reasoned evaluation and decision ...." Sierra Club v. Morton, 510 F.2d 813, 827 (5th Cir. 1975). See also South Louisiana Environmental Council, Inc. v. Sand, 629 F.2d 1005, 1012-1015 (5th Cir. 1980)
 
 
 [24]
 The Secretary of the Army was designated as the Secretary of War until the late 1940's
 
 
 [25]
 The pertinent part of the regulation reads as follows:
 The determination of sufficiency of assurances rests with the Division or District Engineer. It is, therefore, essential that the legal authority of the local agency be thoroughly investigated, and that a firm determination be made that the agency has full legal authority, under local laws, to give the assurances. It must also be established to the satisfaction of the Division or District Engineer that the local agency is financially responsible for the fulfillment of all required local cooperation. Finally, the written assurances must be in strict compliance with the pertinent act of Congress, and the instrument or instruments constituting the assurances must be legally sufficient.
 Engineer Regulation 405-2-680.
 
 
 [26]
 ER 11-2-240 requires that the formal "Project Cost Estimate" for every active project be revised annually to reflect all changes in costs. The approved Project Cost Estimate is then used for all "subsequent programming schedules, performance reports, the Annual Report to the Chief of Engineers, and all other references to estimated costs" within the Corps. ER 11-2-240, §§ 6.a. & 13. See also ER 1110-2-1150 & ER 1165-2-305
 
 
 [27]
 Because a congressional action based upon a specific CBR forecloses judicial review of that CBR, EDF I, 492 F.2d at 1138-41; Sand, 629 F.2d at 1013, the most effective relief available to plaintiffs is prospective in nature. For instance, in section VIII.B. below, we require the Corps to use the interest rate specified in § 1962d-17(a) for all future CBR computations for the TTW
 
 
 [28]
 Our finding that the L&N has standing under the WRDA of 1974 does not affect our discussion in section VI. above. The plaintiffs did not clearly raise any general challenge to the CBRs under this statute. See note 21 above
 
 
 [29]
 The opinion of the District of Columbia Circuit in Izaak Walton League determined that judicial review of CBR computations was not available under several statutes. Although the opinion discusses some issues that are common to this opinion, we would distinguish our analysis on several grounds. The D.C. Circuit did not review either 42 U.S.C. § 1962d-17(b) or the broad statement of Congressional objectives contained in 42 U.S.C. § 1962-2. But most important, the D.C. Circuit did not consider the possibility of judicial review under the APA of internal agency use of CBRs and resulting agency action
 
 
 [30]
 The relevant portion of the regulation is set out in note 25, above. We will point out only one of the more obvious reasons why the requirements of the regulation were not met. The State of Alabama established a special agency, the Tombigbee Valley Development Authority ("TVDA") to identify and implement the state's obligations for the TTW and related water projects in the Tombigbee area. But the TVDA was statutorily prohibited from incurring any monetary obligation until it had received appropriated funds or bond revenues. The TVDA did not receive any such funds until 1974. The State of Alabama was, therefore, incapable of offering the quality of assurances required by ER 405-2-680 until 1974, well after the deadline for the availability of § 1962d-17(b). State of Alabama ex rel. Baxley v. Corps of Engineers, 411 F.Supp. 1261, 1271-73 (N.D.Ala.1976)
 
 
 [31]
 This holding is based on the assumption that Congress intended the Corps to make the determination that the assurances were satisfactory. One could also read the language of § 1962d-17(b) as intending some objective standard of satisfactory: "... if the appropriate non-Federal interests have ... given satisfactory assurances to pay the required ... costs." The appropriate state agency in Alabama was statutorily incapable of issuing such assurances before 1974, and the Corps, therefore, cannot meet even this "objective" standard. Baxley, 411 F.Supp. at 1271-73
 
 
 [32]
 The federal defendants also raised the affirmative defense of laches. We find this defense not to be applicable for two reasons. First, the plaintiff challenged only CBRs prepared and submitted to Congress after the 1976 study. Each such CBR was a separate violation of § 1962d-17(b). The plaintiffs brought this action in 1976, which makes their cause of action timely. Second, we have granted only prospective relief as a remedy, see section VIII.B. below, and laches may not be used as a shield for future, independent violations of the law. The concept of undue prejudice, an essential element in a defense of laches, is normally inapplicable when the relief is prospective
 
 
 [33]
 We acknowledge that the Corps may not be able to identify the precise boundaries of the 70,000 acres that were planned to be used for the TTW at the time of the 1971 EIS. If that is the case, the district court may delineate boundaries that reasonably approximate the 70,000 acres that were envisioned as part of the TTW project in 1971
 
 
 [34]
 Some economic data based upon this exemption may currently be pending before Congress, but we do not order the Corps to revise these figures because it is the prerogative of Congress to require the updating of data before it. Of course, some Corps regulations may require the Corps to make new submissions to Congress or to follow specified internal procedures with the new cost-benefit calculations for the TTW. We do not need to address the Corps' future compliance with any such regulation at this time